**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**
No. 97-60850

2925 BRIARPARK, LTD., JAMES C. MOTLEY,
TAX MATTERS PARTNER,

Petitioners-Appellants,

VERSUS

COMMISSIONER OF INTERNAL REVENUE,

Respondent-Appellee.

_____

Appeal from the Decision of the
United States Tax Court

_____

January 6, 1999

Before REYNALDO G. GARZA, STEWART, and PARKER, Circuit Judges.

PER CURIAM:


I. FACTUAL AND PROCEDURAL BACKGROUND


In 1981, Briarpark was organized as a Texas limited partnership ("the partnership"). James C. Motley ("Motley") was a general partner. During 1983 and 1984, the partnership acquired a three-acre parcel of land at 2925 Briarpark Road, Houston, Texas ("the property") and constructed a 12-story office building on it. On September 27, 1983, the partnership borrowed $21,600,000 from InterFirst Bank Houston, N.A. ("InterFirst") to finance the acquisition of the property and the construction of the building. Motley personally guaranteed the principal,

interest, penalties and fees on the loan.

By December 31, 1986, the outstanding principal and accrued interest due on the loan was $24,700,000. On May 28, 1987, the partnership and InterFirst modified and extended the original loan pursuant to a modified loan agreement. At the time, InterFirst estimated that the fair market value of the property was approximately $17,000,000. The original loan was converted from a recourse to a nonrecourse obligation, and accrued but unpaid interest in the amount of $3,100,000 was capitalized. Motley's personal obligation under his guarantee was limited to $5,000,000. Also on May 28, 1987, Briarpark obtained a $1,500,000 loan for tenant improvements ("build-out loan") on a nonrecourse basis.

By January 21, 1988, First Republic Bank Houston, N.A. ("First Republic") became the successor in interest to InterFirst. The Federal Deposit Insurance Corporation, as receiver for First Republic, assigned the modified loan and the built-out loan to NCNB Texas National Bank ("NCNB").

During March of 1989, Briarpark submitted an application to NCNB seeking to modify the loans to allow a cash sale of the building. In the summer of 1988, at the suggestion of the bank, Motley placed the building on the market, and in March of 1989, he brought to the bank several similar proposals for the sale of the property. At that time, the bank considered as available options: (1) liquidation in the event of a default (but at that

time there was no default); (2) refinancing (which was not an "easily obtained alternative at the level of the debt"); and (3) a sale/settlement, the loan officer expressing the view that "the bank will realize the highest value if the building is sold in 1989." In NCNB's view, the best proposal was a $12,700,000 cash sale offer.

As of July 1989, Briarpark was in default on the loans. On July 21, 1989, the partnership signed a sale agreement to sell the property to Dan Associates. The gross purchase price for the property was $12,200,000. Dan Associates conditioned the purchase of the property upon the partnership's arranging the satisfaction or removal of the encumbrances for consideration paid to NCNB not in excess of $11,490,000. On July 31, 1989, NCNB agreed to release its liens to allow the sale of the property to Dan Associates for $12,200,000, with the proceeds being assigned to NCNB.

On October 5, 1989, Briarpark and Dan Associates amended the sale agreement, reducing the gross sale price to $11,600,000. Under the amended agreement, Briarpark was required to arrange for the satisfaction of the loans and removal of the encumbrances for consideration not exceeding $11,036,000 plus a $175,000 payment by Motley in settlement of his guarantee.

On October 11, 1989, Motley's liabilities exceeded his assets by $13,497,675. On October 16, 1989, NCNB agreed to allow

3

the cash sale of the property for $11,600,000 and to settle with Motley on his guarantee for $175,000.

On November 3, 1989, Briarpark, Motley, Dan Associates, and NCNB entered into a conditional release agreement. NCNB agreed to release the property from all liens and security interests upon satisfaction of the following conditions: (1) the sale of the property to Dan Associates for a minimum gross sales price of $11,600,000; (2) the assignment of the greater of the net sale proceeds or $11,036,000 sale proceeds to the bank, to be applied against the partnership's cash notes; (3) the transfer of the partnership's cash reserves to the bank; and (4) Motley's payment of $175,000 to the bank.

On December 27, 1989, the outstanding balances of the modified and the build-out loan were $24,562,763 and $1,019,418, respectively. Briarpark sold the property to Dan Associates for $11,600,000. Briarpark incurred selling expenses of $554,901. Dan Associates paid the net sales proceeds of $10,936,532 to NCNB. The adjusted basis of the property was $11,105,733.

Also on December 27, 1989, NCNB released the liens against the property and released Motley from his guarantee of the modified loan, in return for his payment of $175,000 in cash. The partnership transferred its cash reserves of $177,495 to NCNB. As of December 31, 1989, Briarpark had no assets and ceased business operations.

On its income tax return for 1989, Briarpark reported

4

cancellation of indebtedness income for $14,468,154 as a result of the November 3, 1989, conditional release agreement.  The reported amount was calculated as follows:

| | |
|---|---:|
| Modified loan balance | $24,562,763 |
| Build-out loan balance | 1,019,418 |
| Total loan Balance | $25,582,181 |
| Less sale proceed from Dan Associates | <10,936,532> |
| Less cash reserves paid to NCNB | <177,495> |
| Net cancellation of indebtedness income | $14,468,154 |

The partnership also reported a net loss on the sale of the property in the amount of $61,245.

Upon audit, the Commissioner determined that the property incorrectly reported discharge of indebtedness income under I.R.C. § 61(a)(12) on its return.  The Commissioner asserts that the partnership realized a gain from dealings in property under I.R.C. § 61(a)(3) because the amount of the discharged debt that had encumbered the property was includable in the amount realized.  The Internal Revenue Service mailed to the partnership a Notice of Final Partnership Administrative Adjustment ("FPAA") proposing adjustments to the partnership's return to reflect realized gain from the sale of $13,920,936, rather than the reported loss of $61,245 and to eliminate the reported cancellation of indebtedness income.[1]  Pursuant to the parties'

---

[1]Generally, where the taxpayer is insolvent immediately after the discharge of a debt, the resulting cancellation of the indebtedness income, ordinarily taxable under I.R.C. § 61(a)(12),

5

stipulation, the Commissioner calculated the partnership's

capital gain as follows:

| | |
|---|---|
| Original loan balance | $24,562,763.35 |
| Build-out loan balance | 1,019,417.65 |
| Total loan balance | $25,582,181.00 |
| Less classing proceeds | <10,936,531.90> |
| Less cash reserves | <177,495.07> |
| Total amount of debt discharged | $14,468,154.03 |
| | |
| Selling price | $11,600,000.00 |
| Total amount of debt discharged | $14,468,154.03 |
| Total amount realized | $26,068,154.03 |
| | |
| Total amount realized | $26,068,154.03 |
| Adjusted Basis and selling expenses | <11,660,633.31> |
| Capital Gain | $14,407,520.72 |

The Tax Court agreed with the Commissioner that the

partnership had realized gains from dealings in property under

I.R.C. § 61(a)(3) rather than discharge of indebtedness income

under § 61(a)(12). The court noted that, for purposes of §§

61(a)(3) and 1001(b), "the amount realized from a sale or other

---

is excludable under § 108. Gains from the disposition of
property under §§ 61(a)(3) and 1001, however, are not excludable
under § 108. Generally, debt-discharge income is recognized at
the partnership level, while the exclusion of such income under
I.R.C. § 108(a) and the concomitant attribute reduction under §
108(b) are applied at the partner level. *See Gershkowitz v.
Commissioner*, 88 T.C. 984 (1987). The tax consequences to an
insolvent partner of a partnership's realizing discharge of
indebtedness income would therefore become apparent only on the
application of such a partnership item to the individual
partner's circumstances. However, it bears noting that Motley's
distributive share of partnership income and loss was 83 percent,
and, while there is no snapshot of the financial standing
immediately after the discharge took place in December of 1989,
the record does reflect that he had become insolvent by October
of 1989, before the sale took place.

disposition of property includes the amount of liabilities from which the transferor is discharged as a result of the sale or disposition." The court found that the sale of the property and the assignment of sale proceeds and transfer of the partnership's cash reserves to NCNB "has the same practical effect as several other transactions which have been held to be a 'sale or exchange.'" According to the court, the transaction at issue "is the functional equivalent of a foreclosure, reconveyance in lieu of foreclosure, abandonment, or repossession" because "the mortgagor in each case is relieved of debt encumbering property and also is relieved of the obligation to pay taxes and assessments against the property."

The court rejected the partnership's argument that NCNB should be regarded as having forgiven, independently of the sale, the excess of the $25,582,181 debt over the $11,114,027 in cash received. Thus, the court disagreed with the partnership's assertion that amount realized on the sale of the property to Dan Associates was only $10,936,532, or less than the partnership's adjusted basis in the property. Far from being "two independent events," as the partnership argued, the court found the record to be "replete with evidence" that the sale and the loan discharges were the "result of a single transaction involving the sale of encumbered property." The court reasoned as follows:

> NCNB conditioned the discharge of the loans upon the
> sale of the property, and Dan Associates conditioned

7

the purchase upon that discharge.  At the end of the
day, NCNB had proceeds from the sale, Dan Associates
had the property, and Briarpark was relieved of the
entire balance of the loans.  In the foregoing context,
the arrangements among NCNB, Dan Associates, and
Briarpark embodied a single transaction to sell the
property securing the loans.

This appeal followed.

## II. STANDARD OF REVIEW

The Tax Court's fact findings are reviewed for clear error because they were based on documentary evidence presented to the court.  *See Pacific Employers Ins. Co. v. M/V Gloria*, 767 F.2d 229, 235 (5th Cir. 1985)(citing *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)).  A finding is clearly erroneous when the reviewing court, upon reviewing all of the evidence, is left with a firm conviction that a mistake has been committed.  *Daniels Towing Service, Inc. v. Nat Harrison Associates, Inc.*, 432 F.2d 103, 105 (5th Cir. 1970)(citing *McAllister v. United States*, 348 U.S. 19, 20 (1954)).  In reviewing the Tax Court's characterization of the transaction, this Court must determine whether its decision was based on a reasonable interpretation of "sale or exchange."  *Yarbro v. Commissioner*, 737 F.2d 479, 483, 486 (5th Cir. 1984).  Finding that the transaction constitutes a sale or exchange would support the Tax Court's conclusion that the transaction was a gain from dealing in property under § 61(a)(3).

8

III. DISCUSSION

The question on appeal is whether the Tax Court erred by holding that the partnership realized a gain from dealings in property in the amount of $14,407,520.72, rather than cancellation of indebtedness income in the amount of $14,468,154.

A. Internal Revenue Code Section 61.
Gross Income

Section 61(a) of the Internal Revenue Code provides that gross income includes all income from whatever source derived, including "gains derived from dealing in property" under § 61(a)(3) and "income from discharge of indebtedness" under § 61(a)(12).  Section 1001(a), which governs the computation of gains from dealings in property, provides that "the gain from the sale or other disposition of property shall be the excess of the amount realized therefrom over the adjusted basis provided." Section 1001(b) defines "amount realized" as "the sum of any money received plus the fair market value of the property (other than money) received."  The amount realized on a sale or disposition of property includes the amount of the liabilities from which the transferor is discharged as a result of the sale or disposition.  TREAS. REG. § 1.1001-2(a)(1); *Commissioner v. Tufts*, 461 U.S. 300, 306 (1983); *Cox v. Commissioner*, 68 F.3d 128, 134 (5th Cir. 1984); *Yarbro*, 737 F.2d at 484.

9

In the case of a property encumbered by nonrecourse indebtedness, the amount realized on disposition includes the entire amount of the mortgage on the property. *Tufts*, 461 U.S. at 312; *Yarbro*, 737 F.2d at 484; *See also* TREAS. REG. §§ 1.1001-2(c)*Example(7)*. The fact that the fair market value of the security at the time of sale or disposition is less than the amount of the liabilities it secures "does not prevent the full amount of these liabilities from being treated as money received from the sale or other disposition of the property." TREAS. REG. § 1.1001-2(b); *Tufts*, 461 U.S. at 310.

There is a distinction between what constitutes income realized from the "discharge of indebtedness" under § 61(a)(12) and income realized from "gains derived from dealing in property" under § 61(a)(3). Under § 61(a)(12), a debtor may realize income from the discharge of indebtedness where his debt is canceled, forgiven or otherwise discharged for less than the full amount of the debt. The Supreme Court has held that when a nonrecourse debt is forgiven, the debtor's basis in the securing property is reduced by the amount of debt canceled, and realization of income is deferred until the sale of the property. *United States v. Kirby Lumber Co.*, 284 U.S. 1, 3 (1931); *Fulton Gold Corp. v. Commissioner*, 31 B.T.A. 519, 520 (1934). This interpretation attributes income only when assets are freed, therefore, an insolvent debtor realizes income just to the extent his assets

10

exceed his liabilities after the cancellation.  *Tufts*, 461 U.S. at 310 n. 11.

Section 61(a)(3) applies when a taxpayer agrees to surrender the property in exchange for the cancellation of a debt.  Under this scenario, the transaction may be characterized as a sale or exchange of property giving rise to income under § 61(a)(3) with the whole amount of the canceled nonrecourse indebtedness being includable in the amount realized under § 1001.  Therefore, § 61(a)(3) applies if the court determines that the transaction: (1) relieved the tax payer-owner of his obligation to repay the debt[2]; and (2) the tax payer is relieved of title of the property.  *Yarbro* 737 F.2d at 486.

### B. Whether Briarpark's Transaction Constitutes a Sale or Exchange for Tax Purposes.

---

[2]An essential point to remember is that the debt herein is "nonrecourse debt."  Nonrecourse debt and recourse debt are treated differently by certain sections of the Code.  Case law firmly establishes that when a taxpayer is relieved of nonrecourse debt, his obligation is canceled and he realizes a value. *Tufts*, 461 U.S. at 312.  Determining whether that value falls under § 61(a)(3) or § 61(a)(12) will further determine whether the insolvent petitioner herein will have to pay taxes on that value or be absolved under § 108.  With a recourse debt, a debtor remains liable for the unpaid balance after a foreclosure sale.  Therefore, the unpaid portion is not used to calculate "amount realized" under § 1001(b).  Furthermore, if the recourse debt is subsequently forgiven, or the judgement is permitted to lapse uncollected, the recourse debt would then fall under § 61(a)(12).  Therefore, if this Court determines that the transaction constituted a "sale or exchange," the value from the nonrecourse debt herein would be governed by § 61(a)(3) and included to calculate "amount realized" under § 1001(b).

11

The Commissioner of Internal Revenue asserts that "Congress intended the words 'sale or exchange' to have a broad meaning, not to be limited to the standard transfer of property by one person to another in exchange for a stated consideration in money or money's worth." *Freeland v. Commissioner*, 74 T.C. 970, 980 (1980); *see Helvering v. Hammel*, 311 U.S. 504 (1941). For example, it has long been established that a foreclosure sale constitutes a "disposition of property" within the meaning of § 1001(b). *Id*. at 506-511; *Cox*, 68 F.3d at 133. A nonjudicial foreclosure sale is also a transaction that triggers taxable gain. *Chilingirian v. Commissioner*, 918 F.2d 1251, 1253 (6th Cir. 1990). It is also well settled that the transfer of property by deed in lieu of foreclosure is the functional equivalent of a "sale or exchange" for federal income tax purposes. *Allan v. Commissioner*, 856 F.2d 1169, 1172 (8th Cir. 1988); *see Laport v. Commissioner*, 671 F.2d 1028 (7th Cir. 1982); *see Millar v. Commissioner*, 67 T.C. 656 (1977), *aff'd*, 577 F.2d 212 (3d Cir.), *cert denied*, 439 U.S. 1046 (1978).

The Commissioner asserts that the Tax Court followed the teaching of *Yarbro* and similar cases by considering the "practical effect" of Briarpark's transaction. Under the conditional release agreement, the bank agreed to release the property from all liens and security interests upon satisfaction of the following conditions: (1) the sale of the property to Dan

12

Associates for a minimum gross sales price of $11,600,000; (2) the assignment of the sale proceeds to the bank; (3) the transfer of Briarpark's cash reserves to the bank; and (4) the payment of $175,000 by Motley to the bank. There was no indication that the bank was willing to forgive any part of the partnership's debt except as a condition of sale to Dan Associates. At the end of the transaction NCNB released all liens against the property, released Motley from his guarantee, and Briarpark had no assets and ceased business operations. Unlike § 61(a)(12) cases, where debt forgiveness occurs as a single transaction and the realization of the property income occurs in a later and separate transaction, the debt forgiveness in the case herein was closely intertwined with the terms of the agreement. Therefore, this was a single transaction governed by § 61(a)(3). *See Fulton*, 31 B.T.A. at 519.

The partnership correctly asserts that the determination of whether a transaction is governed by § 61(a)(3) or § 61(a)(12) depends on the particular facts of the case. *Danenberg v. Commissioner*, 73 T.C. 370, 381 (1979). The petitioners assert that in *Gershkowitz v. Commissioner*, 88 T.C. 984 (1987), the taxpayer's nonrecourse debt settlement was characterized as § 61(a)(12) income and that the divestment of the property, just three months later, was characterized separately as § 61(a)(3) income. The partnership argues that the fact that Briarpark, NCNB, and Dan Associates accomplished both tasks in a single

13

transaction, rather than in two transactions, should not cause the entire transaction to be categorized as § 61(a)(3) income. The partnership also argues that because the purchaser did not assume the debt, the partnership must be treated as having received discharge of indebtedness income.

The Tax Court properly distinguished *Gershkowitz* from this case. In *Gershkowitz*, the debts were not discharged in connection with the disposition of the property. Since there was no disposition of property upon the discharge of the debts, the Tax Court held that there was no amount realized upon disposition that could be regarded as flowing from the discharge of indebtedness, and, hence, no gain or loss on disposition to be computed*. Id*. at 1016. The Tax Court properly found that the partnership's disposition of the property was conditioned upon the relief of its debt and was therefore the functional equivalent of a foreclosure sale. *See Yarbro*, F.2d at 485-86.

The partnership's argument, that the purchaser did not assume the debt, is also without merit. The language of § 1001-2(a)(1) provides that "the amount realized from a sale or other disposition of property includes the amount of liabilities from which the transferor is discharged as a result of the sale or disposition," and does not consider for its purposes whether the purchaser assumes the debt or not. *See also* § 1001-2(c) *Example(7)*.

14

Congress has determined that different tax consequences shall flow from different methods by which the shareholders of a closely held corporation may dispose of corporate property. *United States v. Cumberland Public Service Co.*, 338 U.S. 451, 456 (1959).  Also, it is for the trial court, upon consideration of an entire transaction, to determine the factual category in which a particular transaction belongs.  *Id*.

## IV. CONCLUSION

Upon reviewing the factual findings of this case, this Court agrees with the Tax Court's characterization of this transaction. Therefore, we AFFIRM the Tax Court's decision.

15