**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IN RE: WILSHIRE COURTYARD, *Debtor*, | No. 11-60065 |
| | BAP No. 10-1275 |
| WILSHIRE COURTYARD; JEROME H. SNYDER GROUP I, LTD.; LEWIS P. GEYSER REVOCABLE TRUST; GEYSER CHILDREN'S TRUST, FBO JENNIFER GEYSER, LEWIS P. GEYSER, TRUSTEE; WENDY K. SNYDER; JEROME H. SNYDER; GEYSER CHILDREN'S TRUST, FBO DANIEL GEYSER, LEWIS P. GEYSER, TRUSTEE; RUSSELL & RUTH KUBOVEC, DECEASED, KUBOVEC FAMILY TRUST, RITA FARMER, TRUSTEE; WILLIAM N. SNYDER; JOAN SNYDER; GEYSER CHILDREN'S TRUST, FBO DOUGLAS GEYSER, LEWIS P. GEYSER, TRUSTEE; LON J. SNYDER; SNYDER CHILDREN'S TRUST, FBO WILLIAM N. SNYDER, LEWIS P. GEYSER, TRUSTEE, *Appellants*, | OPINION |
| v. | |
| CALIFORNIA FRANCHISE TAX BOARD, *Appellee*. | |

Appeal from the Ninth Circuit
Bankruptcy Appellate Panel
Kirscher, Pappas, and Sargis, Bankruptcy Judges, Presiding

Argued and Submitted
March 6, 2013—Pasadena, California

Filed September 10, 2013

Before: Dorothy W. Nelson and Richard A. Paez Circuit
Judges, and Suzanne B. Conlon, District Judge.*

Opinion by Judge Paez

**SUMMARY**[**]

**Bankruptcy**

Reversing the judgment of the Bankruptcy Appellate
Panel, the panel held that the bankruptcy court had
jurisdiction to reopen a bankruptcy proceeding to consider the
tax consequences of the reorganization, pursuant to a
chapter 11 plan, of the debtor, a general partnership that
owned two commercial buildings in Los Angeles, into a
limited liability company with a 1% ownership interest in the
property.

---

[*] The Honorable Suzanne B. Conlon, District Judge for the U.S. District
Court for the Northern District of Illinois, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

As part of the bankruptcy, over $200 million of partnership debt was forgiven, and the individual partners reported cancellation of debt income on their tax returns. The California Franchise Tax Board sought to assess $13 million in unpaid income taxes on the partners, characterizing the transaction as a disguised sale and the reported cancellation of debt income as capital gains. The reorganized LLC asked the bankruptcy court to reopen the case.

The panel agreed with the BAP that the bankruptcy court had neither "arising under" nor "arising in" subject matter jurisdiction over the dispute. But it disagreed with the BAP's holding that the bankruptcy court lacked post-confirmation "related to" jurisdiction. The panel reaffirmed that a "close nexus" exists between a post-confirmation matter and a closed bankruptcy proceeding sufficient to support jurisdiction when that matter affects the "interpretation, implementation, consummation, execution, or administration of the confirmed plan." The panel concluded that the ultimate merits question of the sale/non-sale attributes of the transaction depended in part on interpretation of the confirmed plan and confirmation order. In addition, the parties disputed the distinctly federal question of whether 11 U.S.C. § 346 (preempting state tax law) applies to non-debtor general partners of a debtor partnership that was dissolved as part of the reorganization. The panel also concluded that post-confirmation jurisdiction was consistent with the equitable objectives of the Bankruptcy Code.

Holding that the character of the core transaction of the debtor's bankruptcy was an issue that the bankruptcy court had jurisdiction to decide, the panel remanded the case to the BAP to determine in the first instance whether the bankruptcy court's answer to this question gave due consideration to the

"economic realities" of the transaction as structured under the plan and confirmation order.

## COUNSEL

Roy T. Englert, Jr. (argued), Robbins, Russell, Englert, Orseck, Untereiner & Sauber LLP, Washington, D.C.; Daniel L. Geyser, Gibson, Dunn & Crutcher, LLP, Dallas, Texas; David Gould, Gould & Gould, LLP, Calabasas, California; Lewis R. Landau, Calabasas, California; Lewis P. Geyser, Solvang, California, for Appellants.

Bonnie Holcomb (argued) and Marta L. Smith, Deputy Attorneys General; W. Dean Freeman, Supervising Deputy Attorney General; Paul D. Gifford, Senior Assistant Attorney General; Kamala D. Harris, Attorney General, Los Angeles, California, for Appellee.

Howard E. Abrams, Atlanta, Georgia, for Amicus Curiae.

## OPINION

PAEZ, Circuit Judge:

Spanning an entire city block on the "Miracle Mile" portion of Wilshire Boulevard in central Los Angeles are two commercial buildings at the center of a fifteen-year-old bankruptcy proceeding, eleven-year-old state tax dispute, and the present case about the scope of a bankruptcy court's post-confirmation subject matter jurisdiction. The buildings were owned by a California general partnership, Wilshire Courtyard, which filed for chapter 11 bankruptcy after

defaulting on secured debt. As part of the bankruptcy, the partnership was reorganized into a limited liability company ("LLC") with a 1% ownership interest in the property, over $200 million of partnership debt was forgiven, and the individual partners reported cancellation of debt income on their tax returns. The California Franchise Tax Board ("CFTB") now wishes to assess $13 million in unpaid income taxes on the individual partners, characterizing the transaction as a disguised sale and the reported cancellation of debt income as capital gains.

In 2009, the reorganized LLC asked the bankruptcy court to reopen the case to protect the confirmed reorganization plan from CFTB's "collateral attack." The only question we must decide is whether the bankruptcy court had jurisdiction to reopen the bankruptcy proceeding. We hold that the bankruptcy court had jurisdiction, reverse the Bankruptcy Appellate Panel ("BAP"), and remand for further proceedings.

## I. Background

As we do not address the merits of the underlying issue, we present an abridged version of the facts as recounted by the BAP. *See CFTB v. Wilshire Courtyard (In re Wilshire Courtyard)*, 459 B.R. 416, 419–23 (B.A.P. 9th Cir. 2011).

### A. Events before reopening of the bankruptcy case

Wilshire Courtyard was a California general partnership ("Debtor" or "Wilshire Partnership") that developed and owned two commercial complexes on Wilshire Boulevard ("the Property"). After defaulting on its financing arrangements concerning the Property, amounting to almost

$350 million in secured debt, Debtor filed a chapter 11 bankruptcy petition in July 1997. *Id.* at 419. CFTB was listed in the creditor's matrix and received initial notice of the commencement of the bankruptcy proceeding. *Id.* The secured creditors, Debtor, and the individual non-debtor Wilshire partners ("Wilshire Partners") negotiated a Joint Plan of Reorganization ("Plan"). *Id.* As relevant here, Debtor was restructured from a California general partnership into a Delaware limited liability company ("Reorganized Wilshire") that continued to own and operate the Property. *Id.*[1] The senior secured creditors took a 99% ownership interest in Reorganized Wilshire, with the Wilshire Partners retaining the remaining 1%. *Id.* The senior secured creditors contributed $23 million to Reorganized Wilshire and released the secured indebtedness in exchange for the receipt of $100 million in new loan proceeds. *Id.* Debtor's disclosure statement, approved by the bankruptcy court in February 1998, did not address the state tax consequences for the Wilshire Partners and recommended that partners consult their own tax advisors. *Id.* The bankruptcy court confirmed the Plan on April 14, 1998 (the "Confirmation Order"), and closed the chapter 11 case in October 1998. *Id.* at 420.

After the Plan was confirmed, the various Wilshire Partners reported approximately $208 million in aggregate cancellation of debt income on their individual 1998 state tax returns. *Id.* In November 2002, CFTB audited the Wilshire Partnership and challenged the characterization of the tax consequences of the transactions in the Plan as cancellation of debt income. *Id.* CFTB took the position that the Wilshire

---

[1] According to the order confirming the Plan, "Wilshire Courtyard LLC and Reorganized Wilshire Courtyard are successors of the debtor for purposes of Bankruptcy Code sections 1123, 1129, and 1145."

Partnership and ultimately the individual partners should have reported $231 million in capital gain income because the Plan had effected a disguised sale of the Property. *Id.* In June 2004, CFTB issued notices of proposed assessments to individual partners totaling $13 million in unpaid state income taxes. *Id.* Although Wilshire Partners and CFTB engaged in several rounds of administrative hearings over the next five years, the administrative proceedings were suspended when Reorganized Wilshire sought relief in the bankruptcy court.

## B. Bankruptcy court proceedings

In May 2009, Reorganized Wilshire filed a motion to reopen the bankruptcy case, arguing that CFTB was attempting to collaterally attack the confirmed Plan. *Id.* The bankruptcy court granted the motion, and ordered CFTB to show cause why it should not be held in contempt. *Id.* at 420–21. The bankruptcy court also ordered that the Wilshire Partners be joined as parties. *Id.* at 421. Reorganized Wilshire and the Wilshire Partners filed a joint motion for summary judgment asserting that the tax assessment was precluded by the Plan and Confirmation Order. *Id.* In response, CFTB argued that the bankruptcy court lacked subject matter jurisdiction to rule on the motion. *Id.*

Following hearings on the order to show cause and summary judgment motion, the bankruptcy court granted summary judgment to Reorganized Wilshire and the Wilshire Partners, and held that the terms of the confirmed plan also applied to the Wilshire Partners. *In re Wilshire Courtyard,* 437 B.R. 380 (Bankr. C.D. Cal. 2010). At the hearing, the bankruptcy court explained that a finding in the 1998

Confirmation Order ("Finding V")[2] meant that the transaction in the plan was not a sale for any purpose, and thus there was no gain to be taxed to the partnership. *See* 459 B.R. at 422. In its written opinion the bankruptcy court held that the "interests of the partners are wholly derivative from the status of the property in the partnership. In consequence, [CFTB] cannot recharacterize the plan transactions at the partner level without recharacterizing them at the partnership level as well." 437 B.R. at 383.

The bankruptcy court also ruled that it had subject matter jurisdiction for three reasons. *Id.* at 384. First, the bankruptcy court retained subject matter jurisdiction even post-confirmation because the case involved the interpretation of the confirmed Plan. *Id.* The bankruptcy court explained that the determination of income at the partnership level "requires interpretation of the plan and confirmation order." *Id.* Second, a bankruptcy court retains jurisdiction to interpret and enforce its own orders. *Id.* Third, CFTB's argument that the court did not have jurisdiction with respect to the non-debtor Wilshire Partners was unavailing because "this case involves income tax attributes at the individual partner level that derive directly from the plan confirmation order." *Id.* (citing *United*

---

[2] Finding V in the Confirmation Order reads: "The Joint Plan and the agreements, settlements, transactions and transfers contemplated thereby do not provide for, and when consummated will not constitute, the liquidation of all or substantially all of the property of the Debtor's Estate under Bankruptcy Code section 1141(d)(3)(A)." 459 B.R. at 422.

*States v. Basye*, 410 U.S. 441, 448 (1973)).**³** CFTB appealed to the BAP.

## C. Bankruptcy Appellate Panel proceedings

The BAP reversed the bankruptcy court's jurisdictional ruling. *Id.* at 424–34. The BAP analyzed each prong of the statute prescribing the bankruptcy's court's jurisdiction, 28 U.S.C. § 1334(b): "the district courts [and by reference pursuant to 28 U.S.C. § 157, the bankruptcy courts] shall have original but not exclusive jurisdiction of all civil proceedings *arising under* title 11, or *arising in* or *related to* cases under title 11." *Id.* at 424 (emphasis added) (alteration in original).

The BAP reasoned that this case did not meet "arising under" or "arising in" jurisdiction because the right to relief sought in this case is not created by title 11: "No provision of the bankruptcy code dealing with the state tax consequences is at issue, nor were other chapter 11 provisions used by Wilshire in an attempt to restructure the tax consequences of plan confirmation. . . . [T]his contest is at bottom a tax dispute between the Wilshire Partners and CFTB arising under California state tax law, not the bankruptcy code." *Id.* at 425. The BAP also rejected the bankruptcy court's interpretation of Finding V—that no sale had occurred—as a basis for jurisdiction because the disclosure statement and Plan made "no mention of the 'sale/no-sale' attributes of the

---

**³** The bankruptcy court cited *Basye* for the proposition that "partnerships are individual taxable entities and conduits through which taxpaying obligations pass to individual partners," and thus that income character must be determined at the partnership level. 437 B.R. at 384 (citing 410 U.S. at 448).

property transfers, or of the state tax consequences to the Wilshire Partners." *Id.* at 424 n.11. The BAP interpreted § 1334(b)'s "arising in" provision as referring to causes of action which are not expressly rooted in the bankruptcy code but are "unique" to the bankruptcy process, have no "independent existence" outside of bankruptcy, and which cannot not be brought in another forum. *Id.* at 425 (citing *Battle Ground Plaza, LLC v. Ray (In re Ray)*, 624 F.3d 1124, 1131 (9th Cir. 2010)).

Turning to "related to" jurisdiction, the BAP held that the bankruptcy court had misapplied the "close nexus" test when it concluded that interpretation of the Plan and Confirmation Order established a sufficiently close nexus for "related to" jurisdiction. *Id.* at 427. Rather, the BAP held that a nexus is sufficiently close to give rise to post-confirmation jurisdiction only when "the outcome of the issues before the bankruptcy court . . . potentially impact[s] the debtor, the estate, or the implementation of the plan of reorganization," and the tax consequences for the Wilshire Partners would affect none of these. *Id.* at 427, 430.

Finally, the BAP concluded that without any statutory basis for jurisdiction, the bankruptcy court could not exercise supplemental jurisdiction under 28 U.S.C. § 1367(a). *Id.* at 430–31. It also rejected the bankruptcy court's reliance on ancillary jurisdiction to "enable [the bankruptcy court] to vindicate its authority and effectuate its decrees." *Id.* at 431. Once again, the BAP reasoned that the claim here would have no effect on the reorganized debtor (Reorganized Wilshire) or the administration of the bankruptcy estate, because the bankruptcy court's orders interpreting the Plan "did not act to preserve a benefit negotiated in the plan or, indeed, have any effect on the plan of reorganization." *Id.* at 431, 434.

Reorganized Wilshire and the Wilshire Partners timely appealed.

## II. Standard of Review

We review de novo questions of subject matter jurisdiction. *Montana v. Goldin (In re Pegasus Gold Corp.)*, 394 F.3d 1189, 1193 (9th Cir. 2005). The burden of establishing subject matter jurisdiction rests on the party asserting that the court has jurisdiction. *McNutt v. GM Acceptance Corp.*, 298 U.S. 178, 182–83 (1936).

## III. Discussion

The resolution of this case turns on a careful parsing of questions relevant to the jurisdictional issue as distinct from questions relevant to the merits. To some extent, the two are intertwined; the dispute ultimately involves difficult questions about overlapping state tax and federal bankruptcy laws. *See In re Wilshire Courtyard*, 459 B.R. at 418.[4] Nonetheless, the jurisdictional nexus in this case rests on the need to interpret the Plan and Confirmation Order to resolve the merits questions.

---

[4] As we analyze the statutory bases for post-confirmation bankruptcy court jurisdiction, we bear in mind the "general rule" that "when the question of jurisdiction and the merits of the action are intertwined, dismissal for lack of subject matter jurisdiction is improper." *Williston Basin Interstate Pipeline Co. v. An Exclusive Gas Storage Leasehold & Easement in the Cloverly Subterranean, Geological Formation*, 524 F.3d 1090, 1094 (9th Cir. 2008) (internal alterations and quotation marks omitted).

### A. Statutory jurisdiction

We begin with the statutory scheme. Like all federal courts, the jurisdiction of the bankruptcy courts is created and limited by statute. *Celotex Corp. v. Edwards*, 514 U.S. 300, 307 (1995); *In re Ray*, 624 F.3d at 1130. Bankruptcy courts have subject matter jurisdiction over proceedings "arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b); *see also id.* 28 U.S.C. § 157(b)(1).**[5]** We examine each potential basis below.

### 1. "Arising under" and "arising in" jurisdiction

We begin where we agree with the BAP: the bankruptcy court had neither "arising under" nor "arising in" subject matter jurisdiction over the present dispute.

"Arising under" and "arising in" are terms of art. *Harris v. Wittman (In re Harris)*, 590 F.3d 730, 737 (9th Cir. 2000). Proceedings "arising under" title 11 involve causes of action created or determined by a statutory provision of that title. *Id.* Similarly, proceedings "arising in" title 11 are not those created or determined by the bankruptcy code, but which would have no existence outside of a bankruptcy case. *Maitland v. Mitchell (In re Harris Pine Mills)*, 44 F.3d 1431, 1435–37 (9th Cir. 1995).

The Wilshire Partners argue that the bankruptcy court had "arising under" subject matter jurisdiction to reopen the case because the tax dispute is "determined" by 11 U.S.C. § 346.

---

**[5]** Because we hold that the bankruptcy court had "related to" jurisdiction, we do not address the parties' arguments regarding supplemental or ancillary jurisdiction.

Section 346 preempts state tax law in favor of specific provisions detailed in several subsections. 11 U.S.C. § 346(a). The Wilshire Partners argue that § 346(j)(1) determines the result in the present dispute. The relevant version of that statute provides:

> Except as otherwise provided in this subsection, income is not realized by the estate, the debtor, or a successor to the debtor by reason of forgiveness or discharge of indebtedness in a case under this title.

*Id.* § 346(j)(1) (1997).[6]

The Wilshire Partners' argument fails because it presumes the answer to the merits question presented to the bankruptcy court: whether the disputed transaction was a cancellation of indebtedness or a disguised sale. For that question, § 346(j) does not provide the substantive rule of decision. Nor does that question require "resolution of a substantial question of bankruptcy law." *See Haw. Airlines, Inc. v. Mesa Air Grp., Inc.*, 355 B.R. 214, 217 (D. Haw. 2006). The merits question—whether the Plan resulted in a disguised sale or forgiveness of debt—is one that appears to involve a close look at the economics of the disputed transaction, which will warrant analysis of the Plan and Confirmation Order as well

---

[6] The Bankruptcy Abuse Prevention and Consumer Protection Act (BAPCPA) of 2005 amended 11 U.S.C. § 346(j)(1) to read: "For purposes of any State or local law imposing a tax on or measured by income, income is not realized by the estate, the debtor, or a successor to the debtor by reason of discharge of indebtedness in a case under this title, except to the extent, if any, that such income is subject to tax under the Internal Revenue Code of 1986." We consider only the pre-2005 version here.

as reference to state and federal tax and partnership law.[7] *See, e.g.*, *Comm'r v. Tufts*, 461 U.S. 300, 309–10 (1983) (upholding the Commissioner's consideration of the economic realities of disputed transactions, including consideration of the assumptions behind those transactions); *Frank Lyon Co. v. U.S.*, 435 U.S. 561, 573 (1978) ("In applying this doctrine of substance over form, the Court has looked to the objective economic realities of a transaction rather than to the particular form the parties employed."); *Basye*, 410 U.S. at 448; *2925 Briarpark, Ltd. v. Comm'r*, 163 F.3d 313, 317–19 (5th Cir. 1999) (looking to treasury regulations, federal income tax law, and the "particular facts" of the transaction record to characterize whether a partnership realized "a gain from dealings in property" or cancellation of indebtedness income). The merits question does not rest on a substantive provision of the Bankruptcy Code. We decide here only whether the bankruptcy court has jurisdiction to resolve the complex merits question.

Wilshire Partners dispute the BAP's conclusion that "no provision of the bankruptcy code is at issue" by arguing that § 346 was explicitly "at issue" because it "undergirded" Reorganized Wilshire's  motion to reopen under 11 U.S.C.

---

[7] We do not address whether or not the bankruptcy court's reliance on Finding V in the Confirmation Order is sufficient to characterize the transactions at issue as something other than a sale. Similarly, we decline to address the Wilshire Partners' argument that Finding V settles the matter as to the application of § 346. Resolution of these merits questions will require interpreting the Plan in conjunction with the Confirmation Order. Indeed, the Confirmation Order itself states that "to the extent there is any conflict between the Joint Plan and this Order, this Order shall control." On remand, the BAP may consider these issues in the first instance.

§ 1146(d) (1997).**[8]** Section 1146(d) permits bankruptcy courts to

> authorize the proponent of a plan to request a determination, limited to questions of law, by a State or local governmental unit charged with responsibility for collection or determination of a tax on or measured by income, of the tax effects, under section 346 of this title and under the law imposing such tax, of the plan. In the event of an actual controversy, the court may declare such effects after the earlier of (1) the date on which such governmental unit responds to the request under this subsection; or (2) 270 days after such request.

Bankruptcy courts have restricted the post-confirmation availability of § 1146(d), and we have not addressed the issue.**[9]** We need not decide the issue here. The § 1146(d) procedural mechanism for obtaining a determination from a

---

**[8]** Section 1146(d) was recodified in 2005 as § 1146(b).

**[9]** *See, e.g.*, *Kmart Corp. v. Ill. Dep't of Revenue (In re Kmart Corp.)*, No. 02 B 02474, 2012 WL 1744708 (Bankr. N.D. Ill. May 15, 2012); *Allis-Chalmers Corp. v. Goldberg (In re Hartman Material Handling Sys., Inc.)*, 141 B.R. 802, 813 n.16 (Bankr. S.D.N.Y. 1992); S. Rep. No. 989, 95th Cong., at 133 (2d Sess. 1978) ("Subsection (d) permits the court to authorize the proponent of a reorganization plan to request from the Internal Revenue Service (or State or local tax authority) an advance ruling on the tax effects of the proposed plan. If a ruling is not obtained within 270 days after the request was made, or if a ruling is obtained but the proponent of the plan disagrees with the ruling, the bankruptcy court may resolve the dispute and determine the tax effects of the proposed plan.")

state taxing authority or the IRS of the tax consequences of a proposed reorganization plan—authorizing the bankruptcy court to do so only if the taxing authority fails to respond within 270 days—does not transform § 346(j)(1) into a substantive right to relief where the relief sought depends on the characterization of a plan transaction. Section 346(j) addresses the tax consequence of a transaction once the definitive character of "forgiveness or discharge of indebtedness" has been determined. It does not, by itself, create a right to relief sufficient to establish "arising under" subject matter jurisdiction when the character of the transaction is disputed.

The Wilshire Partners do not argue that this case "arises in" the jurisdiction of the bankruptcy court, and we agree with the BAP that this case does not present an issue unique to bankruptcy proceedings "that has no independent existence outside of bankruptcy and could not be brought in another forum." *In re Ray*, 624 F.3d at 1131. "[T]he fact that a matter would not have arisen had there not been a bankruptcy case does not *ipso facto* mean that the proceeding qualifies as an 'arising in' proceeding." 1-3 *Collier on Bankruptcy* ¶ 3.01[3][e][iv] (Myron M. Sheinfeld, Fred T. Witt & Milton B. Hyman, 16th ed. Dec. 2011). Had Wilshire negotiated a similar deal with its creditors outside of bankruptcy, the same dispute with CFTB over whether to categorize the income as cancellation of debt income or capital gains may have arisen.

## 2. "Related to" jurisdiction

We disagree with the BAP's holding that the bankruptcy court did not have "related to" jurisdiction over the present dispute. "A bankruptcy court's 'related to' jurisdiction is very broad, including nearly every matter directly or indirectly

related to the bankruptcy." *Sasson v. Sokoloff (In re Sasson)*, 424 F.3d 864, 868 (9th Cir. 2005) (internal quotation marks omitted).

The test for post-confirmation "related to" jurisdiction was modified from the seminal pre-confirmation *Pacor* test for "related to" jurisdiction, which had been previously adopted by the Ninth Circuit in *Fietz v. Great W. Savings (In re Fietz)*, 852 F.2d 455, 457 (9th Cir. 1988) (citing *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)). Surveying the courts that had applied a limited version of the *Pacor* test in the post-confirmation context, we recognized that the *Pacor* test of whether "'the outcome of the proceeding could conceivably have any effect on the estate being administered in bankruptcy. . . . [I]f the outcome could alter the debtor's rights, liabilities, options, or freedom of action . . . and which in any way impacts upon the handling and administration of the bankrupt estate'" was "somewhat overbroad in the post-confirmation context." *Pegasus Gold Corp.*, 394 F.3d at 1193, 1194 (quoting *In re Fietz*, 852 F.3d at 457).[10]

The "close nexus" test determines the scope of bankruptcy court's post-confirmation "related to" jurisdiction. *Pegasus Gold Corp.*, 394 F.3d at 1194. As adopted from the Third Circuit, the test encompasses matters "affecting the 'interpretation, implementation, consummation, execution, or administration of the confirmed plan.'" *Id.* (quoting *Binder v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.)*, 372 F.3d 154, 166–67 (3d Cir. 2004)). The close

---

[10] We note that all of the cases surveyed finding post-confirmation subject matter jurisdiction under some modified version of the *Pacor* test dealt with bankruptcy proceedings that had been confirmed but not completely consummated. *See id.* at 1193–94.

nexus test "recognizes the limited nature of post-confirmation jurisdiction but retains a certain flexibility." *Id.*

Applying the close nexus test in *Pegasus Gold*, we held that "related to" jurisdiction existed because some claims concerning post-confirmation conduct—specifically, alleged breach of the liquidation/reorganization plan and related settlement agreement as well as alleged fraud in the inducement at the time of the plan and agreement—would "likely require interpretation of the [settlement agreement and plan]." *Id.* The claims and remedies could also "affect the implementation and execution" of the as-yet-unconsummated plan itself. *Id.*

In contrast, the close nexus test was not satisfied in *Sea Hawk Seafoods, Inc. v. Alaska (In re Valdez Fisheries Development Association, Inc.)*, 439 F.3d 545, 548 (9th Cir. 2006). The bankruptcy court there had reopened a dismissed chapter 11 case—in which no plan had ever been confirmed—to determine whether a settlement agreement between a creditor (a seafood processing plant) and former debtor (a fisheries development association) also protected the State of Alaska from the creditor processing plant's fraudulent conveyance claim, where the State was also a creditor but not a party to the settlement agreement. *Id.* at 546–47. The district court affirmed the bankruptcy court's reopening of the case. We reversed because "there was no confirmed plan and there is no claim that the dispute between two creditors, [the processing plant and the State], would have any effect on the now-closed bankruptcy estate." *Id.* at 548. The creditors' dispute was outside the scope of bankruptcy court post-confirmation jurisdiction because the dispute "implicate[d] the term of a settlement agreement approved by the court as a precondition of the dismissal of

[debtor's] bankruptcy. But that agreement has been fully implemented with respect to [the debtor]." *Id.*

Contrary to the BAP's characterization, *Valdez Fisheries* did not restrict or refine the meaning of the close nexus test. Rather, we simply concluded that the claims in the case were outside those matters "affecting the interpretation, implementation, consummation, execution, or administration of the confirmed plan." *Pegasus Gold Corp.*, 394 F.3d at 1194. Because there was no confirmed plan in *Valdez Fisheries*, we reached the same conclusion separately under both the pre-confirmation *Fietz/Pacor* test and the post-confirmation *Pegasus Gold* "close nexus" test.

In interpreting *Valdez Fisheries,* the BAP improperly conflated the two tests. The BAP reasoned that "to show a close nexus, the outcome of a dispute must 'alter the debtor's rights, liabilities, options, or freedom of action or in any way impact upon the handling and administration of the bankrupt estate.'" *In re Wilshire Courtyard*, 459 B.R. at 429 (quoting *In re Fietz*, 852 F.2d at 457). The BAP's reasoning makes the pre-confirmation *Fietz/Pacor* test of whether a separate civil proceeding could "alter the debtor's rights, liabilities, options or freedom of action . . . [or] in any way impact[] upon the handling and administration of the bankruptcy estate," part and parcel of the post-confirmation *Pegasus Gold* post-confirmation "close nexus" test. The two are distinct. The BAP recognized why when it stated, "[t]he *Pacor* test, however, proved less than useful in determining related to jurisdiction after confirmation of a plan because the *bankruptcy estate no longer exists*." *Id.* at 427 (emphasis added).

Similarly, we do not read *Ray*, 624 F.3d at 1134, to have "refined" the *Pegaus Gold* "close nexus" test to incorporate the *Fietz/Pacor* test. *In re Wilshire Courtyard*, 459 B.R. at 430. The lack of jurisdiction in *Ray* was premised on the fact that the dispute there was a matter of pure state law that "did not necessarily depend upon resolution of a substantial question of bankruptcy law" and which could have existed "entirely apart from the bankruptcy proceeding." 624 F.3d at 1135. The breach of contract claim that the state court in *Ray* referred to the bankruptcy court had a relationship to the bankruptcy proceeding only because the bankruptcy court had approved a settlement agreement that sold property free and clear of the right of first refusal. The dispute in *Ray*, unlike that in *Pegasus Gold*, did not involve "implementation and execution of [the bankruptcy plan]." *Id.* at 1134 (quoting *In re Valdez Fisheries,* 439 F.3d at 548).

The BAP "distill[ed]" too narrow a version of the "close nexus" test from *Valdez Fisheries* and *Ray*: "[T]o support jurisdiction, there must be a close nexus connecting a proposed post-confirmation proceeding in the bankruptcy court *with some demonstrable effect on the debtor or the plan of reorganization.*" *In re Wilshire Courtyard*, 459 B.R. at 430 (emphasis added). *Valdez Fisheries* and *Ray* simply applied the *Pegasus Gold* "close nexus" test to the unique—and distinguishable—facts of those cases. We reaffirm that a close nexus exists between a post-confirmation matter and a closed bankruptcy proceeding sufficient to support jurisdiction when the matter "affect[s] the interpretation, implementation, consummation, execution, or administration of the confirmed plan." *Pegasus Gold Corp.*, 394 F.3d at 1194 (internal citation and quotation marks omitted).

The *Pegasus Gold* "close nexus" test requires particularized consideration of the facts and posture of each case, as the test contemplates a broad set of sufficient conditions and "retains a certain flexibility." *Id.* Such a test can only be properly applied by looking at the whole picture.

First, the ultimate merits question depends in part on the interpretation of the confirmed Plan. *Id.* While it is true that the Plan itself is ambiguous as to the sale/non-sale issue and makes no mention of state tax consequences,[11] determination of the sale/non-sale attributes of the transaction requires a close look at the economics of the transaction as detailed in the Plan and Confirmation Order. *See, e.g.*, *Tufts*, 461 U.S. at 309–310, *2925 Briarpark, Ltd.*, 163 F.3d at 317–19. The disputed transaction, described in detail in the Plan and Confirmation Order, was presumably consummated as described, making interpretation of both essential to classifying the character of the transaction.

Understanding "interpretation" to include the Confirmation Order as well as the Plan finds further support in the logic of ancillary jurisdiction—a close cousin to "related to" jurisdiction—because it is well recognized that a bankruptcy court has the power to interpret and enforce its own orders. In the recent decision *Travelers Indemnity Company v. Bailey*, 557 U.S. 137, 151 (2009), the Supreme Court upheld the bankruptcy court's jurisdiction to enter a

---

[11] As CFTB noted in its opposition to the motion for summary judgment in the bankruptcy court, the Plan itself says nothing about a sale of the Properties and does not reference the Bankruptcy Code provisions that provide for a sale of the Property. The Confirmation Order does not comment on whether the debtor retained property of the estate, the tax consequences of the plan, or whether the plan could be treated as a sale for tax purposes.

"Clarifying Order" interpreting the scope of an injunction contained in a prior order confirming a chapter 11 plan entered in 1986 because the bankruptcy court "plainly had jurisdiction to interpret and enforce its own orders." Travelers was the insurer of an asbestos supplier who filed for chapter 11 bankruptcy protection when faced with the prospect of overwhelming liability. *Id.* at 140. To address the needs of future injured claimants, the bankruptcy court and parties confirmed a plan of reorganization in 1986 that created a settlement trust. *Id.* at 141. Travelers and other insurers contributed to the trust on the condition that they were protected by an injunction against future direct claims from injured persons. *Id.* at 141–42. The settlement order was incorporated by reference in the bankruptcy court's order confirming the chapter 11 plan. *Id.* at 142. Over a decade later, direct actions against Travelers commenced, and Travelers sought the bankruptcy court's protection. *Id.* at 142–43. The bankruptcy court issued a Clarifying Order in 2004, providing that the 1986 orders barred the direct actions. *Id.* at 145. The Second Circuit ultimately reversed on jurisdictional grounds, holding that the direct actions were based on a different theory of liability than was covered by the scope of the original injunction and that the claims did not seek remedy from the *res* of the bankruptcy estate. *Id.* at 147.

The Supreme Court reversed on the "easy" jurisdictional issue of whether the bankruptcy court could enter the Clarifying Order. *Id.* at 151 (citing *Local Loan Co. v. Hunt*, 292 U.S. 234, 239 (1934)). The citation to *Hunt* signals the Supreme Court's interpretation that ancillary jurisdiction exists where necessary to preserve a benefit the parties initially bargained for. "That a federal court of equity has jurisdiction of a bill ancillary to an original case or proceeding in the same court, whether at law or in equity, to

secure or preserve the fruits and advantages of a judgment or decree rendered therein, is well settled." *Hunt*, 292 U.S. at 239.

The bankruptcy court in *Travelers* had ancillary jurisdiction to enter the Clarifying Order interpreting the original plan and incorporated injunction precisely because the injunction was critical to the plan's approval. The BAP identified in its analysis that which we find exactly relevant to the present appeal: "the record clearly indicates that the essential parties (the debtor and the insurance companies) would not have agreed to plan confirmation without the settlement agreement and injunction . . . . The Clarifying Order related to an injunction that had been negotiated and considered an *essential part* of the plan of reorganization." *In re Wilshire Courtyard*, 459 B.R. at 433 (emphasis added). We agree with the BAP's characterization of the *Travelers* opinion, but not its application of that opinion to the present case. Here, Reorganized Wilshire and the Wilshire Partners forcefully argue that the "feasibility of any reorganization in this case—which is the entire point of chapter 11 proceedings—was contingent on the cancellation of debt." The Plan itself referenced a number of Bankruptcy Code sections that included the authority to discharge debt. Indeed, the discharge of debt seems central to the conceptual framework of the reorganization plan. Interpretation of the Plan and Confirmation Order is the only way for a court to determine the essential character of the negotiated Plan transactions in a way that reflects the deal the parties struck in chapter 11 proceedings. Under *Travelers* and *Hunt*, this is reason enough for the bankruptcy court to exercise jurisdiction in this case.

Second, the BAP erred in holding that *only* state law claims are at issue in the present dispute. *In re Wilshire Courtyard*, 459 B.R. at 432. Even if the primary question of whether the transaction resulted in capital gains or forgiven debt were a question of pure state tax law, the parties also dispute the distinctly federal question of whether 11 U.S.C. § 346 applies to non-debtor general partners of a debtor partnership that was dissolved as part of the reorganization. The "non-debtor" parties in this case are partners of the former Debtor Partnership that filed a voluntary chapter 11 petition.[12] CFTB argues that it seeks to assess tax liability only against the non-debtor partners, not the non-taxable partnership, and that the latter does not have standing to assert bankruptcy court jurisdiction. CFTB further argues that by its terms, 11 U.S.C. § 346(j)(1) excludes the non-debtor partners of a debtor partnership, referring only to "the estate, the debtor, or a successor to the debtor," and because of this

---

[12] It is not clear from the record whether the general partnership was dissolved as a consequence of the reorganization after the voluntary bankruptcy petition was filed. Nevertheless, even if the partnership was dissolved, under California's Uniform Partnership Act, "a partnership continues after dissolution only for the purpose of winding up its business. The partnership is terminated when the winding up of its business is completed." Cal. Corp. Code § 16802 (1994). Moreover, we disagree with CFTB's characterization that this dispute is one of pure state law between the non-debtor Wilshire Partners and CFTB. In particular, we note that 11 U.S.C. § 346(c)—which also preempts state law, as provided by § 346(a)—may bear on the unsettled bankruptcy law question of whether § 346(j)(1) applies to non-debtor partners. "The commencement of a case under this title concerning a corporation or a partnership does not effect a change in the status of such corporation or partnership for the purposes of any State or local law imposing a tax on or measured by income." 11 U.S.C. § 346(c)(1). We do not address the complicated intersection of bankruptcy and partnership law, but note that it may be relevant to the bankruptcy court's ultimate determination of the merits.

the bankruptcy court lacks jurisdiction to determine the tax liabilities of the non-debtor partners. That legal question is an unsettled one, but ultimately a merits determination and not itself dispositive as to the bankruptcy court's post-confirmation subject matter jurisdiction.

CFTB argues that the identical phrasing in 11 U.S.C. § 505(c) and 11 U.S.C. § 346(j)(1) limiting the application of those statutes to "the estate, the debtor, or a successor to the debtor" requires us to conclude that the bankruptcy court lacked jurisdiction here. CFTB relies on *American Principals Leasing Corporation v. United States*, 904 F.2d 477 (9th Cir. 1990). There, we held that the bankruptcy court lacked jurisdiction to determine the "tax liabilities of non-debtor partners" under § 505(c). *Id.* at 481–82. Our holding in *American Principals* does not aid our interpretation of § 346 because, as explained *supra*, § 346 is not a basis for bankruptcy court jurisdiction, and has never been interpreted to be a "jurisdictional" statute. In contrast, we have consistently interpreted § 505 as jurisdictional because it explicitly confers upon or deprives the bankruptcy court of certain authority. *See Cent. Valley AG Enters. v. United States*, 531 F.3d 750, 755 (9th Cir. 2008).

Moreover, the facts of *American Principals* are inapposite to the present case. There, the tax dispute concerned pre-bankruptcy petition activities reported by non-debtor partners on their pre-bankruptcy tax returns—not transactions that were consummated by the partnership as part of a bankruptcy reorganization plan or proceeding. *Id.* at 479. We held that § 505, which permits a bankruptcy court to "determine the amount or legality of any tax," did not permit the bankruptcy court to determine the tax liabilities of non-debtor partners. *Id.* at 481. Here, the jurisdictional question does not rest on a

determination of tax *liabilities*, although that may be the ultimate consequence of the bankruptcy court's decision. The jurisdictional question here centers on whether the Plan transactions were a sale or a cancellation of debt income and whether that determination bears a sufficiently "close nexus" to the original bankruptcy proceeding. Secondary to that jurisdictional inquiry is whether § 346(j) applies to non-debtor partners of a debtor partnership.[13]

Finally, post-confirmation jurisdiction in this case is consistent with the equitable objectives of the Bankruptcy Code. Here, the bankruptcy court has "related to" subject matter jurisdiction under the *Pegasus Gold* test despite the fact that the Plan transactions have been long since consummated—unlike those in *Pegasus Gold*. To restrict post-confirmation jurisdiction *only* to cases where successful consummation depends on bankruptcy court monitoring would have the practical effect of excluding state tax determinations from bankruptcy court oversight, rendering

---

[13] Moreover, we note that in 2002 CFTB audited the original debtor "Wilshire Courtyard Partnership" as the taxpayer for the year 1998. After the bankruptcy case was reopened on Reorganized Wilshire's motion and while the Order to Show Cause was pending, the bankruptcy court ordered the joinder of the non-debtor partners. Although the tax bill would ultimately be paid by the non-debtor partners, taxable income is "ascertained and reported" at the level of the partnership. *Basye*, 410 U.S. at 448. Only after ascertaining income is the partnership's existence "disregarded since each partner must pay tax on a portion of the total income as if the partnership were merely an agent or conduit through which the income passed." *Id.*; *see also Thompson v. Comm'r*, 631 F.2d 642, 649 (9th Cir. 1980) ("Partnership income or loss is determined at the partnership level and not at the level of the individual partners. The distributive share of income or loss of the individual partners can be determined only by reference to the income or loss of the partnership itself.")

11 U.S.C. § 346 a nullity.[14] Moreover, such a stringent interpretation ignores the fact that tax consequences of reorganization are fundamental to virtually every corporate bankruptcy. Parties to bankruptcy proceedings negotiate against the backdrop of the tax-policy legislative choices codified in the Bankruptcy Code. Here, Reorganized Wilshire and the Wilshire Partners argue that the feasibility of any reorganization was contingent on the cancellation of debt. Had the Wilshire Partners known that CFTB would reclassify the core transaction of the reorganization as a sale and attempt to treat the discharged debt as capital gains, they may never have consented to the reorganization plan, perhaps opting to liquidate the property to the highest bidder, potentially resulting in less or no taxable income for CFTB to assess. Reorganization is often contingent upon the debtor's or plan proponents' assumption of a cancellation of debt that chapter 11 proceedings typically facilitate.[15] Restricting post-confirmation jurisdiction on the grounds that the transactions were long ago consummated and thus taxation would have no

---

[14] A leading treatise identifies the temporal problem presented by tax disputes in bankruptcy proceedings: "[T]axable income and associated tax attributes of the confirmation transactions are always be determined and reported on tax returns filed post confirmation, so by definition, any subsequent audit dispute as to the tax treatment of confirmation transactions will occur post confirmation." 11 *Collier on Bankruptcy* ¶ TX12.02[2][b][ii] (Myron M. Sheinfeld, Fred T. Witt & Milton B. Hyman, 16th ed. Dec. 2011) (alteration in original). We see no practical distinction between post *confirmation* and post *consummation* of a bankruptcy plan and related transactions.

[15] We do not mean that this assumption automatically decides whether cancellation of debt is cancellation of debt *income* or capital gains income. As discussed *supra*, that is a merits question that a bankruptcy court must resolve in the event it is disputed. *See Tufts*, 461 U.S. at 308–09, 310; *2925 Briarpark Ltd.*, 163 F.3d at 317.

effect on the debtor or estate effectively refashions the terms of the deal the parties to the bankruptcy struck in chapter 11 proceedings.

Thus, under the "close nexus" test, post-confirmation jurisdiction in this case extends to matters such as tax consequences that likely *would* have affected the implementation and execution of the plan if the matter had arisen contemporaneously. This application of the *Pegasus Gold* test does not prejudice either taxing entities or bankruptcy parties, nor requires the tax consequences to be assessed before transactions are consummated and taxes are due. It merely allows the bankruptcy court to retain jurisdiction over post-confirmation, post-consummation disputes related to the interpretation and execution of the confirmed Plan as if they had arisen prior to consummation. Thus, we reject CFTB's argument that jurisdiction was lacking because the bankruptcy case had been long since closed by the time the tax dispute began, and that neither the Plan nor Reorganized Wilshire could be affected.

## B.  Bankruptcy court jurisdiction does not violate the Tax Injunction Act

CFTB argues that bankruptcy is not an exception to the Tax Injunction Act, and that here the non-debtor partners are attempting to use a debtor's bankruptcy to shield themselves from the state's tax collection efforts. The Tax Injunction Act provides that "the district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be

had in the courts of such State." 28 U.S.C. § 1341.[16] We have also held, however, that the bankruptcy court may exercise jurisdiction over proceedings that would otherwise violate the Act where the relief sought was necessary to the enforcement of specific Bankruptcy Code provisions. The Act "did not abridge the power specifically granted to the bankruptcy court to make such judgments as may be necessary for the enforcement of the provisions of the Bankruptcy Act. The process of dealing with state tax assessments is one essential to the administration of a bankruptcy estate and does not amount to a suit against the state." *Goldberg v. Ellett (In re Ellett)*, 254 F.3d 1135, 1149 (9th Cir. 2001) (citing *Cal. State Bd. of Equalization v. Goggin*, 191 F.2d 726, 728 (9th Cir. 1951)); *accord In re Hechinger Inv. Co. of Delaware, Inc.*, 335 F.3d 243, 247 n.1 (3d Cir. 2003) ("It is well established, however, that the Tax Injunction Act does not prevent a Bankruptcy Court from enforcing the provisions of the Bankruptcy Code that affect the collection of state taxes.").

Here, the merits question that the bankruptcy court has jurisdiction to decide is a necessary predicate to the enforcement of 11 U.S.C. § 346(j), should the court determine that the transactions were a cancellation of debt income and not a disguised sale under California state law. Indeed, as we recognized in *Ellett*, "it is quite apparent that the Act is incompatible with the Bankruptcy Code's detailed scheme governing the dischargeability of tax debts." 254 F.3d at 1149. CFTB's argument, like Wilshire's argument about § 346 "determining" the outcome of this dispute, presupposes

---

[16] CFTB supports its argument with cases that deal with a different statute, the Anti-Injunction Act, 26 U.S.C. § 7421(a), though that statute is not the basis of CFTB's argument. We do not address the applicability of 26 U.S.C. § 7421(a) here.

the answer to the merits question: that tax is due *because* the core transaction was a disguised sale resulting in capital gains. We only address here whether the bankruptcy court had jurisdiction to decide that question.[17]

## Conclusion

The character of the core transaction of the Debtor's bankruptcy is an issue that the bankruptcy court has jurisdiction to decide. We remand this case to the BAP to determine in the first instance whether the bankruptcy court's answer to this question gave due consideration to the "economic realities" of the transaction as structured under the Plan and Confirmation Order. The real relief sought in this case involves complexities of tax, partnership, and bankruptcy law, which we do not here decide. What we do determine is that the bankruptcy court had subject matter jurisdiction to make the determination, as it is sufficiently closely related to the bankruptcy proceeding. We therefore reverse the BAP's judgment and remand to the BAP for further proceedings consistent with this opinion.

**REVERSED AND REMANDED.**

---

[17] Similarly, we need not address whether the bankruptcy court may enjoin the collection of state taxes against non-debtor partners, *see In re Ellett*, 254 F.3d at 1149 n.7, because we leave for the BAP to consider in the first instance the bankruptcy law question of whether 11 U.S.C. § 346(j) applies to non-debtor partners.