150 T.C. No. 8

UNITED STATES TAX COURT

KARL F. SIMONSEN AND CHRISTINA M. SIMONSEN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 29698-14.                                Filed March 14, 2018.

Ps bought their home with nonrecourse debt. Five years later they
moved out and converted their home to a rental property. Not long
after, they completed a short sale of the rental property, and the bank
discharged the debt. Ps claimed that the short sale and consequent
debt forgiveness were two separate transactions, so they reported a
substantial deductible loss and excludable cancellation-of-
indebtedness (COI) income. R determined that it was one sale or
exchange, there was no COI income, and there was no loss. R also
determined that Ps were liable for a penalty under I.R.C. sec. 6662(a).

Held: The short sale and debt forgiveness were part of one sale or
exchange, and the amount realized included the discharged
nonrecourse debt. There was no COI income.

Held, further, the amount realized was greater than Ps' loss basis
in the property under sec. 1.165-9(b)(2), Income Tax Regs., but less
than Ps' gain basis in the property under that regulation. When

property is sold for an amount between those bases, there is neither a gain nor a loss on the sale.

Held, further, Ps are not liable for a penalty under I.R.C. sec. 6662(a).

Karl F. Simonsen and Christina M. Simonsen, pro se.

Michael S. Hensley, for respondent.

HOLMES, Judge:  Karl and Christina Simonsen bought a home in northern California in 2005.  They got caught in the great recession that began in 2008-- their home's value sank, and they moved to southern California.  They rented out their home for a little while.  But, stuck with a mortgage debt much greater than the value of the home and unable to keep up with their loan payments, they negotiated a short sale.[1]  The Simonsens believe the sale and consequent debt forgiveness are two separate transactions that resulted in both a substantial deductible loss and excludable cancellation-of-indebtedness (COI) income.  The Commissioner says it's all one transaction and the discharged debt is included in

---

[1] In a short sale of real property, "the borrower sells the home to a third party for an amount that falls short of the outstanding loan balance; the lender agrees to release its lien on the property to facilitate the sale; and the borrower agrees to give all the proceeds to the lender." Coker v. JPMorgan Chase Bank, N.A., 364 P.3d 176, 177 (Cal. 2016).

the amount realized on the sale. If the Commissioner is right, the short sale didn't generate a deductible loss and there is no COI income to exclude from the Simonsens' income. He determined that the Simonsens had a deficiency in tax of just under $70,000 and an accuracy-related penalty of almost $14,000.

## FINDINGS OF FACT

Back in the halcyon days of 2005--before most of us could've guessed that easy credit might lead to a global economic crisis--the Simonsens bought a townhouse in San Jose, California for just under $695,000. They put twenty percent down and borrowed the rest from Wells Fargo Bank. In exchange for this purchase-money loan, the Simonsens signed an "Initial Interest Adjustable Rate Note," and their promise to pay was secured by a deed of trust. The parties agree that the loan was nonrecourse debt.

The Simonsens bought their new home in July 2005. Over the next few years they made improvements, which presumably increased their adjusted basis.[2] Then the recession hit and, after living in the townhouse for five years, the Simonsens moved south in September 2010.

---

[2] We explain adjusted basis in more detail later; it's pretty much what property owners paid for a property plus what they later spent to improve it, minus any depreciation.

They also decided to rent out the townhouse. They found tenants that same month, and their townhouse was converted from their personal residence to a rental property. On their 2011 tax return the Simonsens reported that the townhouse had a fair market value of just over $590,000 at conversion and that more than $11,000 in depreciation was allowed or allowable. Since then, the Simonsens have conceded that there was either a transcription error or a TurboTax-computation error on their 2011 return. Christina credibly testified that they intended to report $565,000 as the fair market value at conversion, determined by adjusting comparables in "the 490-ish amount" by a premium of "15 to 20 percent" because their townhouse faced a park instead of a train station or another townhouse. The Simonsens didn't get an appraisal at the time they converted their house into a rental, but later stipulated with the Commissioner that its fair market value at that time was only $495,000.

This brings us to the short sale. By late 2011 the market had not rebounded, and the Simonsens negotiated a sale with Wells Fargo and a third-party buyer in November 2011 that yielded only $363,000. All the proceeds went to Wells Fargo to pay down the loan and cover approximately $26,000 in closing costs.

Wells Fargo forgave the remaining loan balance. In January 2012 the bank sent the Simonsens a Form 1099-C, Cancellation of Debt, showing that the bank

canceled the Simonsens' remaining $219,270[3] debt on November 21, 2011. The Simonsens also received a Form 1099-S, Proceeds from Real Estate Transactions, from First American Title Company, which reported the proceeds of $363,000 and a closing date of November 18, 2011. To the untrained eye, the tax consequences seemed rather plain: a sale for $363,000 and COI income of $219,270. That is precisely what the Simonsens thought when they prepared their 2011 tax return.

With their information returns in hand--namely, the Form 1099-C and the Form 1099-S--the Simonsens prepared and timely filed their 2011 tax return. Christina is not trained in tax law--she is a lawyer but had the misfortune of not taking even Intro Tax in law school. She had, however, prepared her family's tax returns on TurboTax since 2002. The 2011 tax return proved to be a "little tricky" for her, though. She had to use a CD-ROM version of TurboTax instead of the usual online version because she needed a special form--Form 982, Reduction of Tax Attributes Due to Discharge of Indebtedness (and Section 1082 Basis Adjustment)--to properly report the COI income. She credibly explained at trial

---

[3] The parties agree that the amount of cancelled debt reported by Wells Fargo ($219,270) was the total loan balance ($555,960) plus the costs of sale ($26,310), minus the sale price ($363,000). We think it might be more accurate to reduce the sale proceeds by the amount of the closing costs, but this quibble affects neither the bottom line nor our analysis.

that, just like the online version of TurboTax, the CD-ROM version takes you "through that sort of interview style, [and] it kind of fills out the return for you."

The TurboTax interview wasn't the extent of Christina's compliance efforts. Unaware of relevant caselaw,[4] the Simonsens followed the apparent form of the transaction to complete their return, i.e., a sale for $363,000 and COI income of $219,270. They thought the sale resulted in a loss of $216,495, calculated as the difference between the sale price, $363,000, and their converted adjusted basis (reduced by depreciation) in the townhouse, $579,495.[5] But what about the COI income?

Christina knew about the Mortgage Forgiveness Debt Relief Act of 2007 (Act), Pub. L. No. 110-142, 121 Stat. 1803, which modified section 108[6] to provide a new COI-income exclusion for discharged "qualified principal residence indebtedness." Christina credibly testified that she looked at the IRS instructions

---

[4] We asked Christina if she had known about the relevant cases before she prepared the 2011 tax return. She credibly replied that she didn't consider the cases "until this case came about" and only because she "was trying to understand how the IRS was coming to [its] position."

[5] As mentioned above, Christina meant to report a slightly lower converted adjusted basis for the townhouse, which would have decreased the loss.

[6] All section references are the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless we say otherwise.

for what she was filing before she concluded that none of the COI income was taxable and that she didn't need to make a basis adjustment for the townhouse before determining taxable gain or loss.[7]  The COI income was excluded from tax, Christina says, because the townhouse had been the Simonsens' "principal residence" for at least two of the five years before its sale.  And, she explains, their adjusted basis in the townhouse didn't need to be reduced because the Simonsens no longer owned the property after the debt discharge.  She thought this meant that the COI income wasn't taxable and the large deductible loss wasn't affected by any downward adjustment to their basis.  The Commissioner thought this result was too good to be true.

An audit ensued, and in October 2014, the Commissioner sent the Simonsens a notice of deficiency.  The Simonsens, then as now California residents, timely filed their petition.  The only issues for us to decide are the computation of gain or loss on the short sale and liability for a section 6662(a) penalty.  (The Commissioner introduced no evidence that his agent who conducted the audit had his immediate supervisor's written approval of this penalty.)

---

[7] When COI income is excluded, there is typically a corresponding adjustment made somewhere so that the Commissioner doesn't forgo tax forever. See, e.g., sec. 108(b), (h)(1).

OPINION

The computation of gain or loss on the short sale requires that we figure out whether the Commissioner is right that the short sale was a single transaction, or whether the Simonsens are right that there were two transactions--a sale and then Wells Fargo's cancellation of part of their debt. The Simonsens argue that the Act changed the way we treat short sales. If they are right, then we would figure out the tax consequences of first the sale and then the cancellation of debt. The Commissioner argues that, even if the Simonsens are right that we should look at the short sale as two transactions, they would still have to recognize COI income because their home was no longer their principal residence once they moved to southern California.

But first, some vocabulary to understand these arguments better:

- recourse v. nonrecourse debt;

- capital income v. COI income; and

- principal residence v. any other residence.

I.    Relevant Terms

A.    Recourse v. Nonrecourse Debt

"Indebtedness is generally characterized as 'nonrecourse' if the creditor's remedies are limited to particular collateral for the debt and as 'recourse' if the

creditor's remedies extend to all the debtor's assets." Great Plains Gasification Assocs. v. Commissioner, T.C. Memo. 2006-276, 2006 WL 3804622, at *24 (citing Raphan v. United States, 759 F.2d 879, 885 (Fed. Cir. 1985)). California's anti-deficiency statute says:

> No deficiency judgment shall lie in any event * * * under a deed of trust * * * on a dwelling for not more than four families given to a lender to secure repayment of a loan which was in fact used to pay all or part of the purchase price of that dwelling occupied, entirely or in part, by the purchaser.

Cal. Civ. Proc. Code sec. 580b (West 2011).

This means that when home buyers like the Simonsens buy a home with borrowed money, the lender can foreclose but isn't allowed to get a judgment against the Simonsens for any of the debt that remains unpaid after foreclosure. Their other assets remain safe. The parties therefore agree that the Simonsens' purchase-money loan--secured by a deed of trust in California--was nonrecourse debt.[8]

---

[8] We think the parties should've also looked to section 580e(a)(1) of the California Code of Civil Procedure. That section first became effective in January 2011, before the short sale took place. See Cal. Civ. Proc. Code sec. 580e(a)(1) (West 2011). As amended in July 2011, it says:

> No deficiency shall be owed or collected, and no deficiency judgment shall be requested or rendered for any deficiency upon a note secured solely by a deed of trust * * * for a dwelling of not more than four

(continued...)

B.    Capital Income v. COI Income

The parties agree that the loan was nonrecourse debt, but they disagree about the computation of gain or loss and the type of income that might have been realized on the short sale.  The Simonsens say that the sale and the debt forgiveness are separate, and the debt forgiveness resulted in "[i]ncome from discharge of indebtedness" under section 61(a)(12).  The Commissioner argues that the sale and the debt forgiveness are part of the same "sale or exchange"--that the debt discharged is included in the amount realized under section 1001 and any income would be "[g]ains derived from dealings in property" under section 61(a)(3).  Their disagreement isn't novel, but it's important because COI income is

---

[8](...continued)
units, in any case in which the trustor * * * sells the dwelling for a sale price less than the remaining amount of the indebtedness outstanding at the time of sale, in accordance with the written consent of the holder of the deed of trust * * * provided that both of the following have occurred:

(A)  Title has been voluntarily transferred to a buyer by grant deed or by other document of conveyance that has been recorded in the county where all or part of the real property is located.

(B)  The proceeds of the sale have been tendered to the * * * beneficiary * * * in accordance with the parties' agreement.

Cal. Civ. Proc. Code section 580e(a)(1) appears to be directed at short sales like the one in this case; the Simonsens' debt would be considered nonrecourse under it as well.

often not taxable.  See sec. 108(a)(1); sec. 1.61-12(d)(1), Income Tax Regs. (reference to exclusions from gross income that apply to COI income).

"[T]here are various methods of satisfying indebtedness, and each method produces different tax consequences."  Danenberg v. Commissioner, 73 T.C. 370, 381 (1979).  The facts and circumstances of the transaction dictate the type of income created by the discharge of indebtedness; i.e., "whether the realized income is compensation, gain on the disposition of property, rent, dividends, or simply cancellation of indebtedness income."  Id. (quoting James S. Eustice, "Cancellation of Indebtedness and the Federal Income Tax:  A Problem of Creeping Confusion", 14 Tax L. Rev. 225, 231 (1959)).  There are cases where we've held--as the Simonsens urge us to do here--that a nonrecourse loan satisfied at less than the full amount owed produced COI income.  See, e.g., Gershkowitz v. Commissioner, 88 T.C. 984, 1004-14 (1987).[9]  Such cases are exceptional, however, and we have more often found that a disposition of encumbered property

_____

[9] Even Gershkowitz is a little murky.  The Court held that partnerships realized COI income when nonrecourse debts were satisfied with cash settlements rather than the collateral, but that holding was clouded by a lengthy analysis of the partnership debt-reduction-and-deemed-distribution rules.  See Gershkowitz, 88 T.C. at 1004-10.  It was then clouded a bit more by a freeing-of-assets theory that the Commissioner raised and the Court considered.  See id. at 1011-14.  This all led to the Court's referring to *COI income* as *gain*, which we think was inadvertent--and indeed, confusing.  See id. at 1014.

is a sale or exchange in which nonrecourse debt is included in the amount realized.

See, e.g., Estate of Delman v. Commissioner, 73 T.C. 15, 31-33 (1979)

(nonrecourse debt satisfied upon repossession generated gain, and not COI

income); Coburn v. Commissioner, T.C. Memo. 2005-283, 2005 WL 3298877, at

*3 (with nonrecourse debt, "any income realized * * * on the abandonment of the

collateral in satisfaction of the loan is properly treated * * * as a gain on the sale

or other disposition of the collateral rather than discharge of indebtedness

income").

We need to figure out if the short sale of the Simonsens' home was just a

sale or exchange--which would mean that the Code would tax any gain they

realized as capital income--or if it was two transactions, one of which produced

COI income. But before we get there, there is one more bit of vocabulary to

review--"principal residence."

C.     "Principal Residence" v. Any Other Residence

Remember that on their 2011 tax return the Simonsens reported both a

significant deductible loss and COI. They took the position that the COI wasn't

taxable because of section 108(a)(1)(E).

Section 108(a)(1)(E) excluded COI income from gross income if "the

indebtedness discharged is qualified principal residence indebtedness which is

discharged before January 1, 2013." "[Q]ualified principal residence indebtedness" refers to "acquisition indebtedness (within the meaning of section 163(h)(3)(B) * * * *with respect to the principal residence of the taxpayer*." Sec. 108(h)(2) (emphasis added). And "'principal residence' has the same meaning as when used in section 121." Sec. 108(h)(5). The Commissioner doesn't dispute that the loan was "acquisition indebtedness," but he does question whether the townhouse was the Simonsens' "principal residence." If he's right, then it wouldn't matter whether the Simonsens were right about the short sale's having produced COI income.

The cross-reference to section 121 doesn't give an obvious answer to what "principal residence" means--that section doesn't define "principal residence," but only uses the term. It says that gross income doesn't include "gain from the sale or exchange of property if, during the 5-year period ending on the date of the sale or exchange, such property has been owned and used * * * as the taxpayer's principal residence" for two years or more. Sec. 121(a). The regulations are a little more helpful: They tell us to look at all the facts and circumstances to determine whether a taxpayer's residence is his "principal residence," and include a nonexhaustive list of factors. See sec. 1.121-1(b)(1) and (2), Income Tax Regs.

With good reason, the Commissioner doesn't question whether the townhouse was the Simonsens' "principal residence" between July 2005 and September 2010. As far as we know, the townhouse was the Simonsens' only residence during that time, making the facts-and-circumstances analysis superfluous.[10] The Commissioner takes issue, however, with the Simonsens' position that the townhouse was still their "principal residence" after it became a rental property in September 2010.

The Simonsens say that the townhouse continued to be their "principal residence" under section 108(a)(1)(E)--which incorporates through section 108(h)(5) the definition of "principal residence" in section 121--because the townhouse was their "principal residence" for at least two of the five years preceding the short sale. See sec. 121(a). The Commissioner seems to think that the two-of-the-last-five-years rule doesn't apply to section 108(a)(1)(E); instead, we should look at whether the townhouse was the Simonsens' "principal residence" at the moment the debt was discharged. We find that the Simonsens had owned the townhouse for just over six years when they sold it in November 2011. And we also find that during the five years before the sale, they had lived in

_____

[10] The nonexhaustive list of factors is in a section of the regulations that discusses taxpayers who divide their time between two properties. See sec. 1.121-1(b)(2), Income Tax Regs.

it as their "principal residence" for three years and ten months.[11]  If section 121's two-of-the-last-five-years rule applies, the Simonsens are correct that the townhouse continued to be their "principal residence" at the time of the short sale for section-108(a)(1)(E) purposes.

Whether the Simonsens are correct is a genuinely hard question, however, so we'll start by figuring out whether their short sale produced one or two transactions.

II.      The Short Sale: One or Two Transactions?

The Simonsens concede that there was a sale in 2011; otherwise, there wouldn't have been a loss.  But they say the sale of their house to a third party and Wells Fargo's discharge of their debt are two separate transactions that resulted in two reportable items--a loss on the sale of $216,495 and COI income of $219,270. We saw similar facts in 2925 Briarpark, Ltd. v. Commissioner, T.C. Memo. 1997-298, 1997 WL 357880, aff'd, 163 F.3d 313 (5th Cir. 1999), and we found there that the sale and the debt discharge were one transaction--one sale or exchange. The Fifth Circuit agreed.  See 2925 Briarpark, Ltd. v. Commissioner, 163 F.3d 313.

---

[11] From November 2006 through September 2010.

In Briarpark, a partnership owed a bank more than $25 million of nonrecourse debt secured by a property worth only about $10 million. Briarpark, 1997 WL 357880, at *2. The partnership defaulted on the loan, but found someone to buy the property for less than the outstanding debt so long as the bank forgave the rest, i.e., a short sale. Id. The bank agreed, and the sale closed with a cash payment of just over $11 million (including around $175,000 from the partnership's cash reserves) to the bank, which then forgave over $14 million of the remaining debt. Id.

We reasoned that "the sale of the property, the transfer of cash * * * and the assignment of the sale proceeds * * * has the same practical effect as several other transactions which have been held to be a 'sale or exchange.'" Id. at *4 (citing over half a dozen cases involving foreclosures, deed-in-lieu transactions, repossessions, and abandonments). A short sale "is the functional equivalent of a foreclosure, reconveyance in lieu of foreclosure, abandonment, or repossession," and any differences are in form, not substance. Id. We therefore found that the sale and the debt discharge were one sale or exchange for purposes of section 1001 because, similar to those other transactions, the "loans were discharged as a result of a single transaction involving the sale of encumbered property." Id. at *5.

We find that the short sale here was also a single transaction. Christina agreed with the Commissioner at trial that Wells Fargo "facilitated the short sale, [and she] gave the proceeds to the bank"--that Wells Fargo told her "that they're going to cancel th[e] debt and they did." And the Simonsens explained in their brief that "[t]he proceeds of the short sale were not sufficient to completely pay off the mortgage * * * owed on the property; however, *the bank accepted the lesser amount*." (Emphasis added.) The brief discussion at trial and the Simonsens' frank explanation in their brief are consistent with the realities of the transaction, which required Wells Fargo to reconvey the deed of trust in order for the sale to close. See, e.g., Coker v. JPMorgan Chase Bank, N.A., 364 P.3d 176, 185 (Cal. 2016) (in a short sale, as long as the bank kept the trust deed until the sale closed, it could dictate terms of sale).

We think the key point here is the complete dependence of Wells Fargo's willingness to cancel the debt on the Simonsens' willingness to turn over the proceeds from the sale of their home. The Commissioner's view is consistent with the obvious realities of the transaction--that Wells Fargo had to reconvey the deed of trust for the sale to close, and that it would've been able to dictate the terms of the sale as long as it retained the deed of trust. Because Wells Fargo couldn't collect on the debt once it reconveyed the deed of trust--it was nonrecourse debt

after all--the debt forgiveness occurred when the sale closed.[12]  There was but one transaction.

But how to compute the Simonsens' gain or loss from that transaction?

III.    The Gain or Loss Computation

For this we need two numbers: the "amount realized" on the sale and the "adjusted basis" in the townhouse.  See sec. 1001(a); sec. 1.61-6(a), Income Tax Regs.  There would be a loss only if the amount realized was less than the Simonsens' adjusted basis.  Sec. 1001(a).  The parties disagree about the amount realized; we'll discuss that first.  And even though they agree about the Simonsens' adjusted basis, we'll explain that that is a little more complicated than they thought.

A.    Amount Realized

Section 1001(b) defines "amount realized" from the sale of property as "the sum of any money received plus the fair market value of the property (other than money) received."  When there's debt, the general rule is that "the amount realized

_____

[12] The Simonsens even seem to agree with us, stating in their brief: "Admittedly, the cancellation of debt was logically related to the sale since the Petitioners no longer owned the property securing the debt."  They do clarify that admission, however, with an assertion that "the two transactions were not specifically conditioned upon each other as in Briarpark."  We disagree, and look to the real circumstances of the sale, not just how the parties papered it.

from a sale or other disposition of property includes the amount of liabilities from which the transferor is discharged as a result of the sale or disposition." Sec. 1.1001-2(a)(1), Income Tax Regs. And relevant here, "the sale or other disposition of property that secures a *nonrecourse liability* discharges the transferor from the liability." Id. subpara. (4)(i) (emphasis added).

We've found that the short sale is a single transaction--a sale or exchange of the Simonsens's home in exchange for the cash purchase price and the discharge of their debt to Wells Fargo. The Simonsens argue that the amount realized shouldn't include the discharged debt. Their problem here is longstanding caselaw that tells us that we have to draw a line between recourse and nonrecourse debt. And this makes sense--if the Simonsens still owed Wells Fargo money even after the sale, no one could say that the entire debt was "discharged". See, e.g., Aizawa v. Commissioner, 99 T.C. 197, 200-02 (1992) (amount realized in a recourse-mortgage foreclosure doesn't include the recourse-mortgage balance because taxpayer not relieved of the responsibility to repay the loan), aff'd without published opinion, 29 F.3d 630 (9th Cir. 1994); Frazier v. Commissioner, 111 T.C. 243, 245 (1998) ("the amount realized from the sale or other disposition of property that secures a *recourse debt* does not include income from the discharge

of indebtedness"; instead, "the amount realized from the transfer * * * is the fair market value of the property") (emphasis added).

But the Simonsens' loan was nonrecourse debt. And the caselaw also tells us that the amount realized on the sale of property encumbered by nonrecourse debt includes the full amount of the debt. "When a taxpayer sells or disposes of property encumbered by a nonrecourse obligation, the Commissioner properly requires him to include among the assets realized the outstanding amount of the obligation." Commissioner v. Tufts, 461 U.S. 300, 317 (1983); see also Crane v. Commissioner, 331 U.S. 1, 12-16 (1947). These are Supreme Court cases, so we must follow them. But they make sense, too, because the sale of the Simonsens' home did wipe out their obligation to repay Wells Fargo. The Simonsens were relieved of the responsibility to repay the nonrecourse debt when the sale closed, so the amount realized should include the full amount of that debt.

The Simonsens have two final counterarguments. They say that total nonrecourse debt is only included in the amount realized if the debt is assumed by the buyer. And, they argue, the Act creates an exception for homeowners like them.

The relevant regulation, section 1.1001-2(a)(1), Income Tax Regs., says that "the amount realized from a sale * * * of property includes the amount of

liabilities from which the transferor is discharged as a result of the sale or disposition." Nowhere does it limit the rule to cases where a property's buyer assumes the debt. See Briarpark, 163 F.3d at 319 (referring to section 1.1001-2(c), Example (7), Income Tax Regs.)

That leaves only the Act. It also fails to change our analysis, because it changed only section 108, which excludes from tax gross income that would otherwise "be includible in gross income by reason of the discharge * * * of indebtedness of the taxpayer." Sec. 108(a)(1). This means section 108 applies only when there's COI income under section 61(a)(12). See sec. 1.61-12(d)(1) (referencing section 108 for exclusions from gross income that apply to COI income); Gehl v. Commissioner, 102 T.C. 784, 789 (1994) ("Only after it is determined that [section 61(a)(12)] applies does one reach the question of * * * the applicability of section 108"), aff'd without published opinion, 50 F.3d 12 (8th Cir. 1995). But we just found that we must treat the short sale as a single transaction here. This means that we have to apply the rules for computing gain or loss on a sale and not the rules for calculating the amount of COI income.

Because the Simonsens' home loan was nonrecourse debt, the amount realized on its sale includes the discharged debt. They received no consideration

in addition to Wells Fargo's forgiveness cancelling that loan balance, so the amount the Simonsens realized was $555,960.

B.    Adjusted Basis

This brings us to adjusted basis. Adjusted basis is typically what a property owner paid for the property plus what he later spent to improve it, minus allowed or allowable depreciation. Secs. 1011(a), 1012(a), 1016. We'll ask the parties to compute appropriate allowed or allowable depreciation, but we think they'll find that it doesn't make a difference.

We likewise don't think we need to worry about the value of the improvements that the Simonsens made to their home. We know that they paid just under $695,000 for the townhouse when they bought it. We believed Christina when she testified that they made improvements to the property while they lived there. Their adjusted basis in the home might be a bit more than $695,000[13] before they converted it to a rental property.

The parties agree that the Simonsens converted their townhouse to a rental property in September 2010. When a taxpayer does this, his adjusted basis in the property to calculate the amount of any loss changes. See sec. 1.165-9(b)(2),

---

[13] Because it wouldn't affect our analysis of the Simonsens' gain or loss (unless this figure was off by more than $100,000), we don't need to be more precise.

Income Tax Regs.; see also Heiner v. Tindle, 276 U.S. 582, 586 (1928). There's a regulation that we have to follow here. Section 1.165-9(b)(2), Income Tax Regs., tell us to compute a loss using an adjusted basis that is the *lesser* of: (1) the taxpayer's existing adjusted basis or (2) the property's fair market value at the time of conversion. The parties agreed to this number--they stipulated that the fair market value of the Simonsens' home was $495,000 when they converted it to a rental property.

But there's an exception that the parties missed--section 1.165-9(b)(2), Income Tax Regs., applies only when one computes a *loss*; it doesn't apply when one computes a *gain*. This means that the Simonsens' adjusted basis in their home at the time of sale was at least about $695,000 (before depreciation) or $495,000 (before depreciation). To figure out which one it is, we have to know whether the Simonsens were calculating gain or loss.

C.      The Calculation

Here we have a slight problem. The Simonsens realized $555,960, which falls between the basis we would use to calculate a loss ($495,000) and the basis we would use to calculate a gain ($695,000). In other words, the regulations tell us to use a basis in calculating a loss that would result in a gain (because $555,960

is greater than $495,000); but they also tell us to use a basis in calculating a gain that would result in a loss (because $555,960 is less than $695,000).

This is the kind of conundrum only tax lawyers love. And it is not one we've been able to find anywhere in any case that involves a short sale of a house or any other asset for that matter. The closest analogy we can find is to what happens to bases in property that one person gives to another. The Code tells us that the person receiving a gift generally takes the donor's basis in the gift as his own. Sec. 1015(a). But what if such a gift has a value lower than that basis when it is given? The answer that the Code and regulations give us for gifts is that the donee uses the lower fair market value to compute a loss but the donor's basis to compute a gain. Id.; sec. 1.1015-1(a)(1), Income Tax Regs. So far, so similar to the Simonsens' situation. But what to do when a donee sells the gift at a price between these two possible bases? The regulations on gifts tell us: Section 1.1015-1(a)(2), Income Tax Regs., provides that there's no gain or loss. "The no gain or loss answer derives from a conceptual vacuum when the asset is sold for an amount less than its gain basis and more than its loss basis." 1 Arthur B. Willis et al., Partnership Taxation 4-73, para. 4.03[2][c] (8th ed. 2017) (discussing the same odd result that must occur under section 1.165-9(b)(2), Income Tax Regs.) We know this regulation is for gifts and not converted personal residences. But

we think it is logically coherent and adopt it as our holding today. We therefore conclude that the Simonsens realized neither a gain nor a loss on the short sale of their home.

IV.   Accuracy-Related Penalty

The last question is whether the Simonsens also owe a 20% accuracy-related penalty. See sec. 6662(a). Section 6662(a) imposes a penalty when there is "[a]ny substantial understatement of income tax," sec. 6662(b)(2), which exists if the tax understatement exceeds the greater of $5,000 or "10 percent of the tax required to be shown on the return," sec. 6662(d)(1). The Code places the burden of production on the Commissioner, sec. 7491(c), which also requires the Commissioner to produce evidence that the "initial determination" of the penalty was approved in writing by the examiner's supervisor no later than the date the notice of deficiency was issued in this case, sec. 6751(b)(1); see Graev v. Commissioner (Graev III), 149 T.C. ___, ___ (slip op. at 13-15) (Dec. 20, 2017), supplementing 147 T.C. ___ (Nov. 30, 2016).

The Commissioner did meet his burden of production on the amount of the substantial understatement: The total correct tax liability is over $76,000 and the Simonsens reported only $7,000 on their return, an understatement that is much

greater than $5,000 *and* 10% of the tax required to be shown on their return.[14] But

he produced no evidence that he complied with section 6751(b)(1), so he failed to

meet his burden of production on the accuracy-related penalty. See Graev III, 149

T.C. at __ (slip op. at 13-15). If the Commissioner had met his burden of

production, the Simonsens could still avoid the penalty if they proved that they

acted with reasonable cause and in good faith. See sec. 6664(c)(1); sec. 1.6664-

4(a), Income Tax Regs. The reasonable-cause exception is applied "on a case-by-

case basis, taking into account all pertinent facts and circumstances." Sec. 1.6664-

4(b)(1), Income Tax Regs. "Generally, the most important factor is the extent of

the taxpayer's effort to assess the taxpayer's proper tax liability." Id. And

"[c]ircumstances that may indicate reasonable cause and good faith include an

honest misunderstanding of fact or law that is reasonable in light of all of the facts

and circumstances, including the experience, knowledge, and education of the

taxpayer." Id.

---

[14] Our holding that the Simonsens realized neither a gain nor a loss on the short sale differs from the Commissioner's argument on brief--that the Simonsens should've reported a gain. But the notice of deficiency itself disallowed the purported *loss* from the short sale that the Simonsens reported on their return. Because we agree that the Simonsens didn't realize a deductible loss on the short sale, the amount of the tax understatement in the notice of deficiency stands.

One important piece of evidence here is that the Simonsens received two information returns after the sale--a Form 1099-S from the title company and a Form 1099-C from Wells Fargo--which seemed on their face to accurately sum up the transaction; i.e., a sale for which the Form 1099-S was issued and cancellation of debt for which the Form 1099-C was issued. The Form 1099-C said that taxpayers generally "must include all cancelled amounts * * * on the 'Other income' line of" their tax return. But "some cancelled debts are not includible, or fully includible, in * * * income, such as * * * qualified principal residence indebtedness," and taxpayers would be wise to consult IRS Publication 4681.

While reliance on information returns doesn't necessarily prove reasonable cause and good faith, see sec. 1.6664-4(b)(1), Income Tax Regs., it certainly helps taxpayers who rely on them without knowing or having reason to know that the information was incorrect.

We see nothing but reasonable cause and good faith here. The Simonsens are well educated--Christina (who prepared the return) is an attorney--but neither of them is a tax professional. Even to such intelligent people the information returns reasonably indicated that they should report their COI income separately from the sale. So that prompts the question: Did the Simonsens try to comply in good faith with the reporting requirements as they reasonably understood them?

As she'd done for almost a decade, Christina took to TurboTax to prepare the 2011 tax return. The receipt of COI income was new, however, and she consulted the IRS's own instructions to determine how to properly report it. This looks like good faith, too. The IRS hadn't issued regulations for section 108(a)(1)(E), and caselaw is scarce. We've already concluded that it's not obvious whether "principal residence" in section 108(a)(1)(E) incorporates the two-of-the-last-five-years rule of section 121(a), but we do think that a taxpayer without tax expertise could *reasonably interpret* section 108(a)(1)(E) to incorporate that rule. We therefore find that Christina reasonably and in good faith determined that section 108(a)(1)(E) excluded the COI income because the townhouse was their "principal residence."

Section 108(h)(1) doesn't itself say when to adjust basis, and there are no regulations to clarify it. To make matters muddier, the IRS Instructions to Form 982 and IRS Publications 4681 and 523 are consistent with the Simonsens' view that one needs to make a downward basis adjustment only if one keeps the property after the debt is canceled. See IRS Instructions to Form 982 (instructing taxpayers to enter the basis adjustment "[i]f you continue to own your residence after the discharge"); IRS Publication 4681 ("If you continue to own your home after a cancellation of qualified principal residence indebtedness, you must reduce

your basis in the home"); IRS Publication 523 (providing a "tip" that "[a] decrease in basis * * * [under section 108(h)(1)] occurs only if you retain ownership of the principal residence after a discharge"). The Simonsens sold the townhouse at the time the debt was canceled, and we find that this made them reasonably conclude they didn't need to lower their basis.

And, if that weren't enough, the tax issues they faced in preparing their return for 2011 were complex and lacked clear answers--so much so that we ourselves had to reason by analogy to the taxation of sales of gifts and consider the puzzle of a single asset with two bases to reach the conclusion we did. We will not penalize taxpayers for mistakes of law in a complicated subject area that lacks clear guidance, see Everson v. United States, 108 F.3d 234, 238 (9th Cir. 1997); Van Wyk v. Commissioner, 113 T.C. 440, 449 (1999), especially when their bank dangled a red herring of a Form 1099-C in front of them.

We therefore find that the Simonsens' 2011 reporting errors were the result of an honest misunderstanding of the law that was reasonable considering their lack of tax knowledge, the complexity of the issues, and the information returns that they received. And we are convinced, based in large part on Christina's honest and believable testimony, that the Simonsens acted in good faith. Even if

the Commissioner had met his burden of production, we would find that the Simonsens had met their burden of proof in refuting the penalty.

This is a mixed result, so

Decision will be entered under Rule 155.