NOT FOR PUBLICATION

## UNITED STATES BANKRUPTCY APPELLATE PANEL
## OF THE NINTH CIRCUIT

| | |
|---|---|
| In re:<br>J S KALAMA, LLC,<br>　　　　　　Debtor. | BAP No. WW-24-1129-LSG<br><br>Bk. No. 3:20-bk-41495-MJH |
| J S KALAMA, LLC,<br>　　　　　Appellant,<br>v.<br>WILSON OIL, dba Wilcox + Flegel;<br>RUSSELL D. GARRETT, Attorney,<br>Trustee; VIRGIL GENE LIVINGSTON;<br>SANDRA WILSON; UST- UNITED<br>STATES TRUSTEE, SEATTLE,<br>　　　　　　Appellees. | MEMORANDUM* |

Appeal from the United States Bankruptcy Court
for the Western District of Washington
Mary Jo Heston, Bankruptcy Judge, Presiding

Before: LAFFERTY, SPRAKER, and GAN, Bankruptcy Judges.

## INTRODUCTION

J S Kalama, LLC ("Debtor") appeals the bankruptcy court's order of

distribution of estate funds to Wilson Oil, dba Wilcox + Flegel ("W+F").

---

\* This disposition is not appropriate for publication. Although it may be cited for
whatever persuasive value it may have, *see* Fed. R. App. P. 32.1, it has no precedential
value, *see* 9th Cir. BAP Rule 8024-1.

1

After a chapter 11[1] trustee was appointed in Debtor's case, the trustee negotiated a $7 million sale of Debtor's commercial property to W+F. The trustee anticipated, correctly, that the sale proceeds would satisfy all claims against the estate in full. As part of the estate's sale agreement with W+F, the trustee promised to sue Debtor's former tenant (an entity wholly owned by Debtor's owner and manager) based on the estate's claim for, among other things, past-due rent. The trustee further promised to assign any recovery to W+F, effectively reducing the purchase price by the amount of recovery on the rent claim. The court approved this arrangement in connection with its order approving the sale.

After the sale, certain matters involving the estate, W+F, and the prior tenant of the property remained unresolved, including the estate's claim for past-due rent against the former tenant and for disposition of certain items of personal property. The parties reached an agreement resolving these issues.

As relevant here, part of the agreement required that certain funds that had been promised to W+F would be distributed as estate funds to W+F in connection with the trustee's final report if certain conditions were met, including the availability of funds after payment to the estate's creditors and approval of the distribution by the bankruptcy court. Debtor

---

[1] Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and "Rule" references are to the Federal Rules of Bankruptcy Procedure.

initially objected to approval of the settlement agreement, but later consented to entry of an order approving the agreement.

When the trustee was prepared to make a final report and close the case, W+F sought distribution from the estate in accordance with the court-approved settlement agreement. Debtor objected. As Debtor saw it: (i) the trustee was statutorily obligated to pay any surplus to Debtor; (ii) the settlement agreement could not compel Debtor to distribute its funds to W+F; and (iii) the court lacked subject matter jurisdiction over the dispute.

The bankruptcy court disagreed, holding that it had subject matter jurisdiction and that distribution of funds from the estate to W+F was appropriate under the settlement agreement.

We AFFIRM.

## FACTS[2]

### A.    Prepetition events.

In August 2009, Debtor purchased the real property located at 522 Hendrickson Road, Kalama, Washington 98625 (the "Kalama Property") for $3.5 million. From the purchase of the Kalama Property until its eventual sale through bankruptcy, Somarakis, Inc. ("Somarakis") occupied the Kalama Property as Debtor's tenant, and Debtor's only source of income was the rents and charges it received from Somarakis.

---

[2] We have taken judicial notice of the bankruptcy court docket and various documents filed through the electronic docketing system. *See O'Rourke v. Seaboard Sur. Co. (In re E.R. Fegert, Inc.)*, 887 F.2d 955, 957-58 (9th Cir. 1989); *Atwood v. Chase Manhattan Mortg. Co. (In re Atwood)*, 293 B.R. 227, 233 n.9 (9th Cir. BAP 2003).

During the course of Somarakis' tenancy, the Kalama Property had manufacturing equipment installed on the property, which was used for Somarakis' business of manufacturing and repairing liquid ring vacuum pumps and compressors. Somarakis is wholly owned by John Somarakis; Mr. Somarakis also is Debtor's manager and owns 99.75% of Debtor.

Debtor and Somarakis financially struggled for years. Somarakis failed to make all rent payments owed to Debtor under its lease agreement and, as a result, Debtor and Somarakis defaulted on mortgage and property tax payments. Facing notices of default and a downturn in Somarakis' business, Debtor decided to seek bankruptcy protection.

**B.     Debtor's bankruptcy filing and the motion to sell the Kalama Property.**

In June 2020, Debtor filed its chapter 11 petition as a single asset real estate debtor. Other than a claim for rents owed by Somarakis and minimal cash in a bank account, Debtor's only scheduled asset was the Kalama Property, which Debtor valued at $5.5 million. After a failed attempt at confirming a chapter 11 plan, Debtor stipulated to appointment of a chapter 11 trustee (the "Trustee").

The Trustee then moved to reject Debtor's lease with Somarakis and ultimately evicted Somarakis from the Kalama Property. Post-eviction, several fixtures and personal property assets remained on the Kalama Property (the "Equipment").

In November 2022, the Trustee moved to sell the Kalama Property to W+F for $7 million (the "Sale Motion"), an amount that would be sufficient to satisfy all the claims against the estate in full. In connection with the Sale Motion, the Trustee submitted for approval the estate's sale agreement with W+F (the "Sale Agreement"). As relevant to this appeal, the Sale Agreement provided that the Trustee would initiate an adversary proceeding against Somarakis, among others, to: (i) adjudicate the "removal and characterization of" the Equipment; and (ii) assert claims for unpaid rent, taxes, and other costs owed to the estate. The Sale Agreement also required the Trustee to assign its rights in the adversary proceeding to W+F. In other words, the Sale Agreement obligated the Trustee to dispose of estate assets.

Finally, the Sale Agreement provided that the sum of $500,000 would be held back from the purchase price to reimburse W+F for any costs associated with removal of the Equipment (the "Holdback Funds"), subject to approval by the bankruptcy court, and that any balance thereafter would be released to the estate.[3]

---

[3] This provision allowed W+F to recover attorneys' fees and costs incurred in connection with the removal of the Equipment, subject to approval by the bankruptcy court. W+F eventually filed an application for approval of its attorneys' fees and costs before the bankruptcy court, which the bankruptcy court approved as an administrative expense of the estate.

Debtor, Somarakis, and Mr. Somarakis all filed separate objections to the Sale Motion.[4] Notably, although Mr. Somarakis acknowledged in his objection that the sale proceeds would leave a surplus after payment to creditors, neither Debtor, Somarakis, nor Mr. Somarakis argued in their separately filed objections that the offset provided to W+F in the Sale Agreement (i.e., the assignment of the estate's claims for unpaid rent) would potentially invade any surplus that would otherwise be paid to Debtor. In December 2022, the bankruptcy court entered an order approving the sale of the Kalama Property (the "Sale Order").

**C.    The settlement agreement.**

Soon after filing the Sale Motion, and in accordance with the Sale Agreement, the Trustee commenced an adversary proceeding against Somarakis and other defendants to ascertain the ownership of the Equipment (the "Ownership Claims") and collect past-due rents and charges from Somarakis (the "Rents Claim").

Subsequently, the Trustee, Somarakis, Mr. Somarakis, W+F, and certain other entities with interests in the Equipment reached agreements resolving the adversary proceeding. The Trustee thereafter filed a motion for approval of the agreements (the "Settlement Motion").

---

[4] The objecting parties mostly made arguments that are not relevant to this appeal, such as Debtor requesting that the bankruptcy court allow Debtor to obtain financing and propose a chapter 11 plan instead of selling the Kalama Property and Somarakis disputing the ownership of the Equipment.

Among the several settlement agreements submitted for approval via the Settlement Motion was an agreement between the Trustee, Somarakis, Mr. Somarakis, and W+F (the "Settlement Agreement"). The Settlement Agreement accomplished resolution of both the Ownership Claims and the Rents Claim and, in accordance with the Sale Agreement, confirmed the assignment of the estate's rights in the adversary proceeding to W+F.

First, the Settlement Agreement resolved the Ownership Claims by providing that some of the Equipment on the Kalama Property was owned by Somarakis (the "Somarakis Property"), and then setting mutually agreeable procedures to auction the Somarakis Property. Settlement Agreement, ¶ 7. The parties agreed that the $500,000 in Holdback Funds would be utilized to fund the auction. If the auction generated proceeds (the "Auction Proceeds"), the parties further agreed that the Auction Proceeds would be distributed as follows: (i) first, to pay costs of the auction not already satisfied from the Holdback Funds; (ii) second, to the estate to replenish any Holdback Funds used to fund the auction; and (iii) third, to W+F pursuant to the parties' agreement resolving the Rents Claim, as discussed below.

> To resolve the Rents Claim, the parties agreed to the following:
>
> In complete satisfaction of the Assigned Claims, the Settling Parties agree that W+F will receive $475,000 (the "Claims Settlement Amount"), which, until paid in full, shall be paid by the earliest available of: (a) [the Auction Proceeds, using the disbursement scheme described above] and (b) funds

transferred to W+F, pursuant to a stipulation executed by the Parties and the Estate, from surplus funds in the Bankruptcy Case pursuant to an order of disbursement (the "Disbursement Stipulation"), in substantially the same form as Exhibit B, attached hereto. However, nothing contained herein shall be interpreted to create a liability of the Estate or the Trustee to pay the Claims Settlement Amount. The Disbursement Stipulation shall only be paid by the Trustee if it is approved by the Bankruptcy Court as part of the Trustee's final report and accounting, and, if approved, only to the extent that there are funds remaining in the possession of the Trustee for the Estate that are to be turned over to the post-bankruptcy Debtor.

Settlement Agreement, ¶ 9.

Finally, the Settlement Agreement provided that the entire agreement was subject to approval by the bankruptcy court, and that the parties "agree to submit to the exclusive jurisdiction and venue of the Bankruptcy Court with respect to any claims arising from or relating to this Settlement Agreement or the subject matter of this Settlement Agreement." Settlement Agreement, ¶¶ 13, 17.

Debtor objected to the Settlement Motion. Among other objections, Debtor argued that the court should not approve payment of the $475,000 Claims Settlement Amount to W+F because that amount should instead be paid to Debtor as surplus.

The bankruptcy court held a hearing on the Settlement Motion. At the hearing, the parties represented to the court that they were negotiating the terms of an order that would be agreeable to all parties. Debtor

appeared at the hearing and informed the bankruptcy court that it would be withdrawing its objection pending review of the new proposed order. The bankruptcy court allowed the parties to submit either a stipulated order or, if there was a dispute, competing orders.

On May 15, 2023, the bankruptcy court entered an order approving the Settlement Agreement (the "Settlement Order"). Nothing in the record indicates that Debtor or any other party objected to the form of order prior to its entry.

The Settlement Order slightly modified the Settlement Agreement. Among other modifications, the Settlement Order provided that, instead of allowing for distribution of Auction Proceeds to W+F after replenishment of the Holdback Funds, the liquidator would disburse any remaining Auction Proceeds pursuant to a written agreement between W+F, Somarakis, and Mr. Somarakis. If the parties failed to agree on the distribution of the Auction Proceeds, the liquidator would deposit the proceeds into an escrow account.

The Settlement Order did not modify the Settlement Agreement's alternative method of satisfying the Claims Settlement Amount, i.e., by seeking court authorization to pay the Claims Settlement Amount via distribution from the estate in connection with the Trustee's final report and accounting.

The auction did not produce sufficient proceeds to pay W+F any part of its Claims Settlement Amount.

**D. The dispute over distribution of estate funds.**

Eventually, the Trustee determined that the estate would have funds remaining after distribution to all creditors. As a result, in June 2024, the Trustee filed a motion regarding distribution of potential surplus proceeds.

Soon thereafter, W+F filed a motion to be included in the Trustee's final distribution in accordance with the approved Settlement Agreement (the "Motion for Inclusion"). W+F essentially argued that all parties, including Debtor, consented to W+F receiving a distribution of $475,000 from any remaining surplus if W+F was not satisfied in full from the Auction Proceeds.

Debtor objected to the Motion for Inclusion. In its opposition, Debtor argued, among other things, that the estate was not required to make a distribution to W+F and that the bankruptcy court lacked jurisdiction to resolve the dispute. In a separate filed response to the Trustee's motion for distribution, Debtor also argued that any distribution of funds to W+F would violate the distribution scheme under § 726(a).

The court held a hearing on the Motion for Inclusion, at which time it approved the distribution of $475,000 to W+F prior to any distribution of surplus to Debtor. The court reasoned that Debtor had withdrawn its objection to the Settlement Agreement, and that W+F had relied on the provisions in the Settlement Agreement regarding the funding of its Claims Settlement Amount. The court further noted that the provisions were part

of the overall agreement with the estate and were important to effectuate matters that were beneficial to the estate.

Subsequently, the court entered an order granting the Motion for Inclusion and allowing distribution of $475,000 to W+F (the "Distribution Order"). Debtor timely appealed.[5]

## JURISDICTION

As further discussed below, the bankruptcy court had jurisdiction under 28 U.S.C. §§ 1334 and 157(b)(2)(A) and (O). We have jurisdiction over the bankruptcy court's determination under 28 U.S.C. § 158.

## ISSUES

1. Did the bankruptcy court have jurisdiction to enter the Distribution Order?

2. Did the bankruptcy court err in holding that W+F was entitled to distribution from the estate?

3. Did the Distribution Order violate the priority scheme set forth in § 726(a)?

---

[5] After Debtor appealed the Distribution Order, the Trustee filed a motion for approval of a structured dismissal of Debtor's case (the "Structured Dismissal Motion"). Debtor responded to the Structured Dismissal Motion by noting that it does not oppose a structured dismissal, but that any order dismissing the case should be stayed until resolution of this appeal. Debtor also filed a motion for a stay pending appeal. The court subsequently entered two orders approving a structured dismissal but staying any distribution to W+F and the dismissal of Debtor's case until resolution of this appeal.

11

## STANDARDS OF REVIEW

Questions regarding jurisdiction are reviewed de novo. *Durkin v. Benedor Corp. (In re G.I. Indus. Inc.),* 204 F.3d 1276, 1279–80 (9th Cir. 2000). Interpretation of a settlement agreement is a question of law that we also review de novo. *See Renwick v. Bennett (In re Bennett)*, 298 F.3d 1059, 1064 (9th Cir. 2002). De novo review means that we review the matter anew, as if the bankruptcy court had not previously decided it. *Francis v. Wallace (In re Francis)*, 505 B.R. 914, 917 (9th Cir. BAP 2014).

Otherwise, "[w]e review a bankruptcy court's findings of fact for clear error and review de novo its conclusions of law." *Leavitt v. Alexander (In re Alexander)*, 472 B.R. 815, 820 (9th Cir. BAP 2012).

## DISCUSSION

On appeal, Debtor contends that: (i) the bankruptcy court lacked subject matter jurisdiction to enter the Distribution Order; (ii) the Settlement Agreement did not obligate the Trustee or the estate to distribute funds to W+F; (iii) Debtor cannot be bound by the Settlement Agreement; and (iv) the Distribution Order violates the priority scheme set forth in § 726(a).[6]

As we discuss in section A, we believe functions as crucial as determining whether an entity has a right to distribution of estate funds,

---

[6] We note that the Trustee did not seek approval of a distribution under § 726(a); rather, the Trustee requested approval of a structured dismissal in a chapter 11 case. As we discuss below, such structured dismissals must approximate the distribution scheme set forth in § 726(a).

deciding the order of such distributions by a representative of the estate, and interpreting and applying prior final orders disposing of estate assets necessarily invoke the core jurisdiction of bankruptcy courts. Thus, we hold that the court had subject matter jurisdiction over this dispute. As we discuss in section B, we disagree with Debtor's interpretation of the Settlement Agreement and conclude that the estate was obligated to disburse $475,000 to W+F in accordance with the Settlement Agreement approved by the bankruptcy court.

Finally, as we discuss in section C, even if the distribution to W+F violates the Code's priority scheme, Debtor's consent to the Settlement Agreement allowed for an alteration of the order of priorities.

## A. The bankruptcy court has subject matter jurisdiction over distribution of estate funds.

"Subject matter jurisdiction defines the court's authority to hear a given type of case; it represents the extent to which a court can rule on the conduct of persons or the status of things." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) (cleaned up). "Like all federal courts, the jurisdiction of the bankruptcy courts is created and limited by statute." *Wilshire Courtyard v. Cal. Franchise Tax Bd. (In re Wilshire Courtyard)*, 729 F.3d 1279, 1284 (9th Cir. 2013) (citing *Celotex Corp. v. Edwards,* 514 U.S. 300, 307 (1995)).

That statute is 28 U.S.C. § 1334, through which Congress granted bankruptcy courts, by referral from district courts, "original and exclusive

jurisdiction of all cases under title 11," 28 U.S.C. § 1334(a), and "original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." 28 U.S.C. § 1334(b).

Prior to delving into the court's jurisdiction, it is important to delineate exactly what the bankruptcy court adjudicated. Debtor contends that the dispute before the bankruptcy court was "a civil matter between two non–parties to the case over a private agreement," referring to W+F and Somarakis as the two "non-parties" before the court.

However, this is a mischaracterization of the matter before the bankruptcy court. The bankruptcy court did not adjudicate any dispute between W+F and Somarakis. Neither W+F nor Somarakis sought a determination from the bankruptcy court regarding their obligations vis-à-vis each other under the Settlement Agreement.

The actual issue before the bankruptcy court was whether W+F was entitled to receive a distribution from the estate[7] and, if so, if the Code

---

[7] As further discussed below, Debtor asserts that the disputed funds are not property of the estate, but instead belong to Debtor by operation of § 726(a)(6). However, during the pendency of the bankruptcy case and prior to its closure, the Trustee represents the estate and controls its assets, including funds in estate accounts. §§ 323, 349, 1106. That Debtor may have an interest in the funds once all other required entities are paid gives Debtor standing to present arguments with respect to the funds, but such a future interest does not transform the funds from property of the estate to Debtor's property prior to final distribution of the funds and closure of this case, neither of which has occurred. Thus, we properly frame the issue before us as one involving disbursement of funds **from the estate**, and not from Debtor.

In any event, as we conclude in sections B and C, pursuant to the Settlement Agreement, Debtor consented to distribution of the estate funds to W+F ahead of

14

allowed for such distribution ahead of Debtor. That dispute did not even involve Somarakis. Rather, among other alleged creditors who claimed an interest in the funds and who are not relevant to the instant appeal, the dispute was between W+F, which asserted a right to distribution pursuant to its agreement with, among others, the estate, and Debtor, which asserted a right to distribution under the Code, namely, § 726(a)(6).

Given that the issue before the court was a determination regarding the order of distribution of funds, i.e., a core function of bankruptcy courts, it is difficult to conceive of any reason why the court would lack subject matter jurisdiction over the Distribution Order. And while it is true that part of the court's analysis hinged on interpreting whether an agreement involving nondebtor parties (as well as the estate) altered the statutory order of distribution, as discussed below, that interpretation did not divest the court of subject matter jurisdiction over distribution of estate funds.

While Debtor may argue that the court's interpretation was wrong, or otherwise violated the Code, these issues are separate from the issue of whether the court had **subject matter jurisdiction** to determine them in the first place. As discussed below, we believe the court not only had "related to" jurisdiction, as disputed by Debtor, but also "arising in" jurisdiction.

---

Debtor, and thus the subject $475,000 is not property of Debtor either before or after closure of this case.

15

## 1. The bankruptcy court had "arising in" jurisdiction over this dispute.

As articulated in 28 U.S.C. § 1334(b), bankruptcy courts may exercise jurisdiction over matters that (i) "arise under" the Code (i.e., where the Code provides the rule of decision); (ii) "arise in" a bankruptcy case (i.e., the proceeding would not exist outside of the bankruptcy case); or (iii) are "related to" a bankruptcy case (i.e., the outcome of the proceeding could conceivably have an effect on administration of the estate). *In re Wilshire Courtyard*, 729 F.3d at 1285-87.

"A matter 'arises under' the Bankruptcy Code if its existence depends on a substantive provision of bankruptcy law, that is, if it involves a cause of action created or determined by a statutory provision of the Bankruptcy Code." *Battle Ground Plaza, LLC v. Ray (In re Ray)*, 624 F.3d 1124, 1131 (9th Cir. 2010) (citations omitted). A proceeding "arises in" a case under the Code "if it is an administrative matter unique to the bankruptcy process that has no independent existence outside of bankruptcy and could not be brought in another forum, but whose cause of action is not expressly rooted in the Bankruptcy Code." *Id.* (citation omitted).

Although the overarching dispute in this case arose from a statutory function of the court, i.e., distribution of property of the estate under § 726(a), resolution of this matter, as illuminated below, depends on application of both bankruptcy and state law. Thus, the matter does not solely "arise under" the Code.

16

However, a dispute of this nature – regarding which entities are entitled to distribution from the estate and in which order – can only arise in a bankruptcy case. As noted above, 28 U.S.C. § 1334(a) grants "exclusive" jurisdiction to bankruptcy courts over bankruptcy "cases." The term "case" refers to the bankruptcy petition itself, *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 225 n.38 (3d Cir. 2004), *as amended*, and is "the basis for taking control of all pertinent interests in property, dealing with that property, **determining entitlements to distributions**, the procedures for administering the mechanism, and discharging the debtor." *Menk v. LaPaglia (In re Menk)*, 241 B.R. 896, 908 (9th Cir. BAP 1999) (emphasis added).

Logically, distribution of estate assets depends on the existence of an estate in the first place, i.e., the filing of a bankruptcy petition. Such distribution would not exist anywhere outside of bankruptcy. The bankruptcy court, and no other court, is tasked with presiding over this distribution in accordance with the Code.[8] Consequently, a dispute that arises regarding the propriety of distribution of estate assets is an "administrative matter unique to the bankruptcy process that has no

---

[8] Confusingly, Debtor argues in its brief before the Panel that, "[a]lthough the [Distribution Order] affects the amount of Surplus Funds left in the estate, that is only because it was the bankruptcy court that made the order." Appellant's Brief, p. 24. Of course, the bankruptcy court entered the Distribution Order because it was the **only** court that could do so.

independent existence outside of bankruptcy and could not be brought in another forum." *In re Ray*, 624 F.3d at 1131.

It is true that part of the resolution of this matter rests on interpreting the Settlement Agreement under state law. However, the application of nonbankruptcy law, standing alone, does not eject a matter from the core jurisdiction of the bankruptcy court. For instance, the Ninth Circuit has found "arising in" jurisdiction where the debtor sued the trustee and third parties in state court, asserting state law causes of action, regarding a settlement agreement approved by the bankruptcy court. *Harris v. Wittman (In re Harris)*, 590 F.3d 730, 738 (9th Cir. 2009). Despite the fact that the debtor asserted state law causes of action, the Ninth Circuit held that the action could not exist outside of bankruptcy because it involved the trustee's conduct in administering the estate. *Id.*

Similarly, here, notwithstanding the application of Washington law to interpret the Settlement Agreement, a dispute regarding distribution of estate funds could not exist independent of the bankruptcy case. In addition, as in *Harris*, the mere fact that third parties, such as Somarakis, are signatories to the Settlement Agreement does not divest the court of subject matter jurisdiction.

Ultimately, the bankruptcy court adjudicated whether to direct an estate representative to distribute estate funds pursuant to an agreement to which the estate was a party and which the court approved. It would

18

stretch the limits of credulity to hold that such a matter was outside the core subject matter jurisdiction of the bankruptcy court.

## 2. The bankruptcy court had "related to" jurisdiction over this dispute.

Debtor appears to focus its jurisdictional argument on whether the bankruptcy court had "related to" jurisdiction. Although we hold that the court had "arising in" jurisdiction, we further conclude that, at a minimum, the court had "related to" jurisdiction over this dispute.

An action is "related to" a bankruptcy case if the outcome of the proceeding could conceivably alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) in such a way as to impact the administration of the bankruptcy estate. *Fietz v. Great W. Sav. (In re Fietz)*, 852 F.2d 455, 457 (9th Cir. 1988) (adopting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)). "Congress intended to grant comprehensive jurisdiction to the bankruptcy courts so that they might deal efficiently and expeditiously with all matters connected with the bankruptcy estate." *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 (1995).

As noted above, Debtor mischaracterizes the matter before the bankruptcy court. As Debtor explains it, the dispute involves: (i) two nondebtor entities (Somarakis and W+F); (ii) over a "private agreement"; (iii) with no conceivable impact on Debtor's bankruptcy case.

In fact, the opposite is true. The dispute involves (i) Debtor, the estate, and a party asserting it has a right to distribution from estate funds;

(ii) over an agreement approved by the bankruptcy court that resolved, among other things, disputes over estate assets and obligations; (iii) with an impact on the estate that is clear simply by reference to the fact that final distribution of estate assets is impossible without resolution of this dispute.

To the extent Debtor argues the instant matter is divorced from the estate's involvement with the Sale Agreement and the Settlement Agreement, and assuming that's relevant to analyze whether a bankruptcy court has jurisdiction over disbursement of estate funds, a brief recounting of the trajectory of Debtor's case reflects the level of entanglement between the instant dispute and the estate's previous dealings with W+F.

Notwithstanding Debtor's valuation of the Kalama Property at $5.5 million, the Trustee negotiated a sale and settlement with W+F for $7 million, an amount that funded payment of all creditors of the estate in full. In exchange for W+F's transfer of the funds that would pay all claims against the estate, the estate undertook certain obligations beyond simply transferring the Kalama Property to W+F.

As more fully discussed below, one of those obligations was to satisfy the Claims Settlement Amount in connection with the Trustee's final distribution of assets if certain conditions were met, including approval by the bankruptcy court. The Claims Settlement Amount cannot be severed from the overall deal reached between the estate and W+F. The Claims

Settlement Amount was meant to settle the Rents Claims,[9] which the Trustee first agreed to transfer to W+F as part of the Sale Agreement. As a result, the Claims Settlement Amount appears to be in furtherance of W+F's and the estate's overall bargain, starting with the sale of the Kalama Property, continuing through the settlement and resulting auction, and, if other methods of satisfaction proved unsuccessful, ending with distribution of the Claims Settlement Amount. Given that the Settlement Agreement contemplated both the estate's and the court's continuing involvement with enforcement of the Settlement Agreement through the closure of Debtor's case, the impact on estate administration is especially evident.

As a result, even if the court lacked "arising in" jurisdiction,[10] the court had "related to" jurisdiction.

_____

[9] As Debtor points out, the Claims Settlement Amount was originally intended to satisfy the Rents Claim owed by **Somarakis** to W+F, after the estate transferred its interest in the claim to W+F. Despite this, the court approved the Settlement Agreement, including the clause regarding W+F's ability to receive a distribution from the estate, under the applicable standards. *See* Rule 9019. The Settlement Order approving the Settlement Agreement was never appealed and, as a result, is a final order to which the parties are bound. *See Thomas v. Bible*, 983 F.2d 152, 154 (9th Cir. 1993) (a "court is generally precluded from reconsidering an issue that has already been decided by the same court"). It is too late for Debtor to criticize the prudence of the Trustee's business judgment in agreeing to the terms contained in the Settlement Agreement.

[10] At certain points in Debtor's brief, Debtor also asserts that the court did not have the "power" to enter the Distribution Order. "Subject matter jurisdiction and power are separate prerequisites to the court's capacity to act. Subject matter jurisdiction is the court's authority to entertain an action between the parties before it. Power. . . is the scope and forms of relief the court may order in an action in which it has jurisdiction." *Am. Hardwoods, Inc. v. Deutsche Credit Corp. (In re Am. Hardwoods, Inc.)*,

**B.    The estate was obligated to pay the Claims Settlement Amount to W+F if certain conditions were met.**

Turning to the merits of the matter before us, Debtor next argues that the estate did not have an obligation to pay the Claims Settlement Amount. In support of this argument, Debtor references the following clause from the Settlement Agreement:

> In complete satisfaction of the Assigned Claims, the Settling Parties agree that W+F will receive $475,000 (the "Claims Settlement Amount"), which, until paid in full, **shall** be paid by the earliest available of: (a) the W+F Turning Center Payment and (b) funds transferred to W+F, pursuant to a stipulation executed by the Parties and the Estate, from surplus funds in the Bankruptcy Case pursuant to an order of disbursement (the "Disbursement Stipulation"), in substantially the same form as Exhibit B, attached hereto. However, **nothing contained herein shall be interpreted to create a liability of the Estate or the Trustee to pay the Claims Settlement Amount**. The Disbursement Stipulation shall only be paid by the Trustee if it is approved by the Bankruptcy Court as part of the Trustee's final report and accounting, and, if approved, only to the extent that there are funds remaining in the possession of the Trustee for the Estate that are to be turned over to the post-bankruptcy Debtor.

---

885 F.2d 621, 624 (9th Cir. 1989).

To the extent Debtor argues that the bankruptcy court did not have the power to enter a final order on the Motion for Inclusion, our conclusion that the court had "core," "arising in" jurisdiction defeats the argument. Courts may enter final orders on core matters. *See Stern v. Marshall*, 564 U.S. 462, 475-78 (2011). Even if this matter is not "core," parties may consent, even impliedly, to entry of a final order by a bankruptcy court. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 684–85 (2015). Debtor likely consented to entry of a final order by non-Article III judges by appealing to this Panel. *Richards v. Richards (In re Richards)*, 655 B.R. 782, 795 (9th Cir. BAP 2023).

Settlement Agreement, ¶ 9 (emphases added).

Debtor focuses on a single sentence within this clause that reads: "nothing contained herein shall be interpreted to create a liability of the Estate or the Trustee to pay the Claims Settlement Amount." According to Debtor, this sentence absolves the estate of any obligation to disburse $475,000 to W+F.

Debtor's interpretation would render void the remaining language in ¶ 9. Under Washington law,[11] "we harmonize clauses that seem to conflict. Our goal is to interpret the agreement in a manner that gives effect to all the contract's provisions." *Nishikawa v. U.S. Eagle High, LLC*, 158 P.3d 1265, 1268 (Wash. Ct. App. 2007) (citation omitted). Contracts must be considered "as a whole" and given "a fair, reasonable, and **sensible** construction." *Kut Suen Lui v. Essex Ins. Co.*, 375 P.3d 596, 599 (Wash. 2016) (internal quotation marks omitted) (emphasis added).

The Settlement Agreement **requires** satisfaction of the Claims Settlement Amount from one of two sources: the Auction Proceeds or disbursement of funds from the estate. *See* Settlement Agreement, ¶ 9 (the Claims Settlement Amount "shall" be paid from the earliest available of the two sources).[12] To obtain satisfaction from the latter source, the Settlement

---

[11] Pursuant to ¶ 17 of the Settlement Agreement, the parties agreed that Washington law governs interpretation of the Settlement Agreement.

[12] The record is clear that the Auction Proceeds did not generate sufficient funds to pay any portion of the Claims Settlement Amount. Thus, the only source left to satisfy the Claims Settlement Amount was a disbursement by the estate.

Agreement states that the **Trustee** can pay W+F only if the distribution is approved by the bankruptcy court and "as part of the Trustee's final report and accounting." *Id.*

Under basic principles of bankruptcy administration, the Trustee has the power to distribute estate funds in accordance with the Code and bankruptcy court authorization. §§ 323, 704(a)(9), 1106. Had the Settlement Agreement envisioned distribution by an entity other than the estate and/or the Trustee, or contemplated the distribution of funds that were not property of the estate, there would be no reason at all for ¶ 9 to mention distribution by the Trustee in connection with a final report or require authorization by the bankruptcy court. Thus, a holding that ¶ 9 does **not** obligate the Trustee or the estate would render meaningless all of the language regarding the Trustee, the final report, and court authorization.

The more harmonious reading of the language shielding the estate from liability is that it protects the estate in case the conditions set forth in the Settlement Agreement were not satisfied. Those conditions, contained in the sentence directly after the one referenced by Debtor, are: (i) approval by the bankruptcy court; and (ii) the availability of "funds remaining in the possession of the Trustee for the Estate that are to be turned over to the post-bankruptcy Debtor."[13] Reading the sentence regarding liability in conjunction with these conditions leads us to the conclusion that the estate

---

[13] There is no dispute that both of these conditions occurred.

was shielded from liability if the court did not approve disbursement and/or the estate did not have sufficient funds in its possession.

This interpretation gives effect to every word in ¶ 9. Debtor's interpretation, on the other hand, would require a distribution from the estate only to immediately state in the very next sentence that distribution from the estate was **not** required. This interpretation would neither be "sensible" nor give effect to every provision in the Settlement Agreement. *Kut Suen Lui*, 375 P.3d at 599; *Nishikawa*, 158 P.3d at 1268.

Because our interpretation of the Settlement Agreement obligated the **estate** to disburse funds to W+F, Debtor's argument that the Settlement Agreement improperly bound **Debtor** to act by transferring its own property (i.e., any surplus distributed to Debtor) is without merit.[14] Apart from the liability language in ¶ 9 discussed above, Debtor's arguments on this point appear to stem from two points: (i) first, that the Settlement Agreement states that the distribution to W+F will come from the "surplus"; and (ii) second, that the Trustee stated in the body of the Settlement Motion that the distribution to W+F would be a "post-bankruptcy transfer."

With respect to the first argument, although the parties nominally referred to the Claims Settlement Amount as being sourced from the

---

[14] Nor was Debtor a necessary party to the Settlement Agreement. At the time the parties executed the Settlement Agreement, the Trustee was the representative of the bankruptcy estate with full control of the estate's claims and liabilities and the ability to resolve them.

25

"surplus," in effect, the parties essentially agreed to pay the Claims Settlement Amount ahead of Debtor. As discussed above, ¶ 9 of the Settlement Agreement explicitly provides for distribution "by the Trustee if it is approved by the Bankruptcy Court as part of the Trustee's final report and accounting." If the distribution were to come instead from a surplus already paid to Debtor, the Trustee would not be tasked with distribution along with the final report, and bankruptcy court authorization would not be required.

Debtor's second argument suffers for much the same reason. A clause that contemplates distribution by the Trustee, with approval by the bankruptcy court, is by definition not a "post-bankruptcy transfer." In any event, the Trustee's characterization of the Settlement Agreement in the Settlement Motion is not pertinent to our interpretation of the Settlement Agreement. Under Washington law, courts do not consider extrinsic evidence if "the parties' intent can be divined from the actual words within the four corners of the document." *Seattle Times Co. v. LeatherCare, Inc.*, 337 F.Supp.3d 999, 1054 (W.D. Wash. 2018) (citing *Hearst Comms., Inc. v. Seattle Times Co.*, 115 P.3d 262 (Wash. 2005)). Here, we can glean the parties' intent from the four corners of the Settlement Agreement; our interpretation gives full effect to the provisions, and we need not consult another document to make sense of the provisions in the Settlement Agreement.

In light of the above, the estate was obligated to disburse the Claims Settlement Amount to W+F before paying Debtor any remaining surplus.

**C. The distribution to W+F does not run afoul of the priority scheme set forth in § 726(a).**

Finally, Debtor contends that the distribution to W+F violates the priority scheme of § 726(a). *See Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017). Specifically, Debtor contends that § 726(a)(6) mandates distribution to the debtor after payment of all claims against the estate.

In *Jevic*, the Supreme Court considered whether a bankruptcy court could dismiss a chapter 11 without reverting to the prepetition status quo or adhering to the priority scheme set forth in the Code. *Id.* at 456. In other words, the Court assessed whether bankruptcy courts could order "structured dismissals" through which the bankruptcy court not only dismissed the case but altered the prepetition relationship between the debtor and creditors. *Id.*

The Court held that any such "structured dismissal" must follow the ordinary priority rules set forth in the Code. *Id.* at 464. In so holding, the Court referred to the Code's statutory priority scheme as "a basic underpinning" of bankruptcy law and "fundamental to the Bankruptcy Code's operation." *Id.* at 464-65.

Significantly, the Court specified that its holding applied only to **nonconsensual** alterations in the Code's priority scheme. *See id.* at 464 (framing the issue presented as whether a bankruptcy court may "approve a structured dismissal that provides for distributions that do not follow ordinary priority rules **without the affected creditors' consent**") (emphasis

27

added); *and id.* at 465 (dismissal does not allow for "**nonconsensual** priority-violating distributions of estate value") (emphasis added).

That parties may consent to the alteration of the Code's priority scheme is uncontroversial. In fact, the Code itself contemplates such alterations. For instance, § 726(a) – the statute Debtor contends requires distribution to Debtor ahead of W+F – explicitly provides that § 510 may alter the distribution scheme set forth in the statute. Section 510(a), in turn, allows parties to agree to subordinate their claims to other claims against the estate. The Code also, for example, permits chapter 11 plans to alter the priority scheme with the consent of impacted creditors. § 1129; *see also In re Arnold,* 471 B.R. 578, 592 (Bankr. C.D. Cal. 2012) ("The heart of the Chapter 11 process is creditor consent.") (citing Elizabeth Warren & Jay Westbrook, THE LAW OF DEBTORS AND CREDITORS 677 (6th ed. 2009)).

Here, even if the distribution to W+F would otherwise violate § 726(a),[15] Debtor consented to the distribution scheme ordered by the bankruptcy court. Debtor's arguments to the contrary are unconvincing.

---

[15] Although Debtor contends that it had a right to payment of surplus, the Code is structured such that debtors are very last in line to receive a distribution from the estate, behind satisfaction of all other obligations of the estate. As discussed above, the Settlement Agreement created an obligation of the estate to pay W+F. Thus, payment to W+F ahead of Debtor may not have violated the Code's priority scheme at all.

Nevertheless, because Debtor consented to the distribution of funds to W+F ahead of Debtor, we need not reach the question of whether the distribution to W+F would otherwise violate § 726(a) without Debtor's consent.

Debtor places immense weight on the fact that it did not sign the Settlement Agreement.[16] But this argument ignores fundamental aspects of the bankruptcy process. Unlike the usual two-party disputes in state court, where the effect of contracts is generally litigated, a chapter 11 bankruptcy case involves a collective process with several parties in interest. § 1109(b). Those parties in interest, including the debtor, "may raise and may appear and be heard on any issue in a case under this chapter." *Id.*; *see also Truck Ins. Exch. v. Kaiser Gypsum Co., Inc.*, 602 U.S. 268, 280–81 (2024) (holding that § 1109(b) allows for "broad participation" by all parties in interest).

This participation includes the ability to object to settlement agreements involving the estate. As a result, even where a party is not a signatory to the settlement agreement itself, if it is a "party in interest," the party may object and raise concerns regarding the impact of the agreement on the party's rights in the estate.

In this case, Debtor took advantage of its standing as a party in interest and objected to the Settlement Agreement's provision allowing W+F a distribution of $475,000 ahead of Debtor. Although Debtor did not sign the Settlement Agreement itself, Debtor was afforded a full and fair opportunity to argue its concern regarding the order of distribution of funds. The record demonstrates that the court considered Debtor's

---

[16] Of course, the Settlement Agreement **was** signed by Mr. Somarakis, who is both the manager and majority owner of Debtor, and thus would presumably be the signatory on behalf of Debtor as well.

argument and allowed Debtor and other parties in interest an opportunity to modify the Settlement Order in a manner that satisfied all of the parties.

Debtor fully consented to entry of the Settlement Order in its final form. While the Settlement Order did modify the Settlement Agreement with respect to distribution of the Auction Proceeds, it left intact the Settlement Agreement's provision regarding distribution to W+F ahead of Debtor in the case of a surplus estate. Debtor did not appeal the Settlement Order, and the time to appeal that order has long since expired. Accordingly, even if the distribution to W+F altered the Code's order of distribution, Debtor consented to the alteration.

For all the reasons stated above, the court's order directing the Trustee to distribute $475,000 to W+F from the estate was appropriate.

## CONCLUSION

The bankruptcy court did not err in ordering distribution of $475,000 to W+F ahead of any distribution to Debtor. We therefore AFFIRM.